**UNITED STATES of America, Plaintiff,**

v.

**Bronislaw HAJDA, Defendant.**

No. 94 C 5174.

United States District Court, N.D. Illinois, Eastern Division.

April 11, 1997.

Linda Wawzenski, U.S. Attorney's Office, Chicago, IL, Edward A. Stutman, U.S. Dept. of Justice, Office of Special Investigation, Criminal Div., Washington, DC, for U.S.

George B. Collins, Gregory Abbott Bedell, Collins & Bargione, Chicago, IL, Paula M. Uscian, Uscian & Eccleston, Chicago, IL, for Bronislaw Hajda.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

This matter is before the court pursuant to a complaint filed under Section 340(a) of the Immigration and Nationality Act of 1952, as amended (hereinafter, the "INA"), 8 U.S.C. § 1451(a), to revoke the citizenship of defendant Bronislaw Hajda (hereinafter "Defendant" or "Hajda"), set aside the November 29, 1955 order of the United States District Court for the Eastern District of Michigan admitting Defendant to citizenship, and cancel Certificate of Naturalization No. 7537428 issued pursuant to that order. The government seeks this relief on the ground that Defendant was ineligible to receive a visa to the United States for the following reasons: During the period of the German occupation of Poland during World War II,

1. Defendant served as an SS auxiliary in the guard units at SS Training Camp Trawniki;

2. Defendant served as an armed guard at the Treblinka Labor Camp;

3. Defendant served in the SS Battalion Streibel; and

4. Defendant misrepresented his activities during the war in an effort to gain entry into the United States.

The parties have submitted an extensive "Statement of Uncontested Facts and Law" in the Pretrial Order. Subsequently, the parties filed "Additional Agreed Findings of Fact." For purposes of continuity, the statement and the additional agreed findings will be attached to this memorandum opinion and are incorporated by reference into this court's findings. See Attachments "A" and "B," respectively.

## FINDINGS OF FACT

### The Government's Case Against Bronislaw Hajda

### I. WACHMANN HAJDA

There can be no serious dispute that on or about January 9, 1943, one Bronislaw Hajda arrived at the Training Camp at Trawniki, Poland, was processed as a guard, and assigned identification number 3069. For present purposes, that person will be referred to as "Wachmann (guard private) Hajda."

As part of his training, Wachmann Hajda guarded prisoners at the Trawniki Labor Camp and was armed with a rifle. On or about March 22, 1943, Wachmann Hajda was transferred as part of a group of 55 Trawniki men[1] to SS Labor Camp at Treblinka ("Treblinka Labor Camp") to serve as reinforcements for the guard detachment. At the Treblinka Labor Camp, his unit guarded the perimeter of the camp to prevent prisoners from escaping and also guarded prisoners en route to and from the slave labor sites and the sites themselves. In addition to the guard rosters and transfer lists identifying Wachmann Hajda as a guard at Trawniki and Treblinka, several persons who admitted to being guards at Treblinka identified Wachmann Hajda as also being a guard. In

1. Graduates of the training at Training Camp Trawniki are sometimes referred to as "Trawniki Men."

testimony at proceedings following World War II, several of these former guards identified Wachmann Hajda as having participated in atrocities, including the mass killing and beating of Jewish and Polish prisoners at the Treblinka Labor Camp. (*See, e.g.*, Government Exhibits (Govt. Exs.) Nos. 8, 87, and 196). It is undisputed that unspeakable horrors were routinely visited upon the Jewish and Polish prisoners at the camp. (*See* Statement of Agreed Facts attached hereto.)

On or about July 22, 1944, as the Russian army advanced, all but a few Jewish prisoners at the Treblinka Labor Camp were massacred by camp guards as part of the evacuation of the facility. All of the guard units serving at the camp participated in this horrible activity. The camp was completely evacuated a day or two later.

Following the evacuation, members of the guard detachment from Treblinka regrouped in the City of Kielu and later rejoined the remaining members of the SS Training Camp Trawniki, forming SS Battalion Streibel (hereinafter the "Streibel Battalion"). The name Bronislaw Hajda and identification number 3069 appear on a list of 20 guards assigned to a unit of the Streibel Battalion located on the Vistula River. At some time during this period, Wachmann Hajda was promoted to the rank of SS Oberwachmann (private first-class). As of December 14, 1944, Oberwachmann Hajda was listed on a roster of the "Detachment Platoon Pinczow." On December 19, 1944, he was detailed to the "Detachment Belh." On January 5, 1945, he was transferred to the 1st Company of the Streibel Battalion at Motkovice, Poland. As the Soviet Army drove westward, the Streibel Battalion retreated. By mid–February 1945, the Streibel Battalion set up a new headquarters in Medingen, Germany, ten miles north of Dresden. Oberwachmann Hajda remained a member of that unit until at least April 6, 1945.

On the night of February 13, 1945, Anglo–American bombers unleashed their terrible incendiary bombing raids on the City of Dresden. The newly arrived members of the Streibel Battalion, including Oberwachmann Hajda, were assigned to clear away the rubble and remove bodies. Some time before April 25, 1945, the Soviet Army overran the positions of the Streibel Battalion. While he remained on the guard roster as of April 16, 1945, it is not clear whether Oberwachmann Hajda deserted his unit near Dresden, or whether he retreated with it into Czechoslovakia where the Streibel Battalion disintegrated near the end of April 1945. Near the end, officers of the Streibel Battalion advised their men to move west in small groups and to surrender to the United States armed forces rather than to Soviet troops.

## II. RELATIONSHIP BETWEEN DEFENDANT AND WACHMANN HAJDA

Documents from Russia establish that the Wachmann Hajda's personnel file was in the possession of Soviet authorities after the war. Although the file is missing, its contents are summarized in Soviet records. The following information is known about Wachmann Hajda from those records:

| | |
|---|---|
| Name: | Bronislaw Stanislaw Hajda |
| Born: | March 19, 1924 |
| Birth place: | Jordanov, Poland |
| Nationality: | Gurale |
| Citizenship: | Poland |
| Occupation: | Bootmaker (cobbler) |
| Height: | 165 centimeters |
| Facial shape: | Oval |
| Color of eyes: | Blue |
| Hair color: | Blond |

The following is known about Defendant Hajda:

| | |
|---|---|
| Name: | Bronislaw Hajda |
| Born: | March 19, 1924 |
| Birth place: | Jordanov, Poland |
| Nationality: | Gurale |
| Citizenship: | Poland (originally) |
| Occupation: | Apprentice cobbler |
| Height: | 173 centimeters (currently) |
| Facial shape: | Oval |
| Color of eyes: | Blue |
| Hair color: | Dark brown/black(currently) |

In addition, Defendant's father was named Stanislaw. It was customary to give the father's name as the son's middle name.

The government contends that these similarities establish beyond any reasonable doubt that Defendant and Wachmann Hajda are the same person. Moreover, the government cites to statements by Defendant's father and sister made in connection with postwar proceedings that Defendant worked with

the SS during the war. Kazimiera Hajda stated, "[M]y brother served in the German military, in the SS." (Govt. Ex. 182 at 2 (English Translation)). Stanislaw Hajda stated, "[M]y son went to Germany to join the SS." (Govt. Ex. 187 at 4 (English Translation)).

### The Defendant's Contentions

The Defendant contends that he is not, and could not be, Wachmann Hajda because Defendant never served as a guard at Trawniki, Treblinka, or in the Streibel Battalion. While Defendant disputes that he served in these units and that he misrepresented his wartime activities in order to gain entry into the United States, he does not dispute that such activities, if proven, would have rendered him ineligible to receive a visa under the Displaced Persons Act of 1948 ("DPA"), Pub.L. No. 80–774, ch. 647, 62 Stat. 1009, June 16, 1950, Pub.L. No. 81–555, ch. 262, 64 Stat. 219 (1950).

## I. DEFENDANT'S BACKGROUND

Defendant testified that he was born in the small town of Jordanov, Poland, on March 19, 1924. His mother was Zofia, and his father was Stanislaw, a shoemaker. Defendant had a brother Wladyslaw, and two sisters, Maria and Kazimiera. Before the war, Defendant had obtained six years of schooling.

Some time in 1942, Defendant was traveling by train to Warsaw to purchase leather for his father when he was arrested by Gestapo agents on the train. He was taken to Warsaw to a prison called Pawiak. Later he was taken to another prison in Warsaw, where he remained for approximately six months. He was then transferred to another prison in Krakow, called Montelupich. He remained there for less than six months before being transferred to Camp Pustkow (hereinafter "Pustkow"). He does not remember the date on which he arrived at Pustkow.

When he arrived at Pustkow, Defendant was taken to the office where those in charge took the names of the prisoners and gave them numbers. He does not recall his number, except that it contained the numerals "2 and 0" and the remaining number was fif-

teen, sixteen, or seventeen. The prisoners' numbers were sewn on the front and the rear of their clothing. At Pustkow, Defendant wore the same clothing that he was wearing when he was arrested on the train. He wore his prison uniform over his own clothing.

Defendant recalls cutting trees, unloading prefabricated barracks from rail cars, and digging tank traps at Pustkow. He also recalls seeing rockets at Blizna when he was working nearby. In addition, he remembers an incident when a V–2 rocket crashed and killed a German general and seeing the casket of the general with a flag draped across it. This was one of only a few times that he saw a dead person during his stay at Pustkow. The second time was when his work party was returning to camp one evening. The body of a prisoner who had escaped was placed on a chair with a sign around his or her neck which read, "I have returned again." The third time was when he had to carry a body out for cremation. Defendant further testified that he never saw a prisoner punished or beaten at Pustkow.

## II. STANISLAW SWIECHOWICZ

While at Pustkow, Defendant says he saw Stanislaw Swiechowicz, whom he had known from Jordanov. According to Defendant, Swiechowicz approached him and said, "Bruno" to which Defendant replied, "Stashnik." Swiechowicz was wearing striped prisoner clothing when Defendant saw him. Swiechowicz lived in the barracks and Defendant could not recall whether they were the same barracks in which Defendant lived. He saw Swiechowicz one other time. Defendant contends that Swiechowicz can verify his imprisonment at Pustkow. Defendant also asserts that his family had knowledge of his imprisonment at Pustkow.

Defendant does not recall when he left Pustkow, except that the weather was cold. He left via a train that eventually arrived in Dresden, Germany. He was uncertain as to how long the trip took, but stated that it could have taken as long as five months. He arrived in Dresden either two weeks prior to the Allied firebombing of that city or two weeks thereafter. Defendant escaped in

Dresden and made his way to the American lines.

### The Historical Account of Pustkow

Before attempting to sort out the facts about Defendant's wartime activities, it is instructive to look at what the historians say about Pustkow. Most of what is known about Pustkow is contained in two exhibits: Government Exhibit 176—Judgment against Hanns Prochinsky, November 14, 1973; and Government Exhibit 174—Stanislaw Zabierowski, *Pustkow: Hitlerowskie obozy wyniszczenig w sluzbie Poligonu SS* (Rzeszow: Krajowa Agencja Wydawniczg, 1981) (hereinafter the "Zabierowski").

The facts herein described have not been disputed. Pustkow was located on the grounds of the SS Troop Training Base Debica, located near the Polish city of Debica (66 miles east of Krakow). The camp took its name from the nearby village of Pustkow. After the German V–2 rocket base at Peenemunde was bombed by the Allies, Hitler decided on August 22, 1943, to move a part of the base to Blizna which was within the perimeter of the SS Troop Training Base at Debica.

> Between the years 1940 and 1944, one of the components of the Nazi armed forces, the Waffen SS, established a large military camp in the forest adjacent to the village of Pustkow near Debica. The camp housed the command of the SS training ground which surrounded it. To build the camp and the numerous military facilities throughout the entire exercise area, the SS used the displaced inhabitants of nearby villages, who were paid starvation wages as well as an unpaid labor force of prisoners, and prisoners of war who had been incarcerated in the three extermination camps that had been set up in Pustkow: a labor camp for Jews, a camp for Soviet prisoners of war, and a forced labor camp for Poles.

(Zabierowski, Govt. Ex. 174 at 1 (English translation)).

The first Polish forced laborers arrived on September 16, 1942, consisting of almost 1100 criminals from Zamek prison in Lublin. It was from this original group of criminals that the appointed camp leaders were chosen. They preyed upon other prisoners and did not hesitate to humiliate, beat, or kill their countrymen. Polish prisoners continued to arrive throughout 1942. The following arrivals are documented:

| | | |
|---|---|---|
| 1. | October 6, 1942 | — 33 prisoners from the Gestapo prison at Montelupich; |
| 2. | October 1942 | — 7 prisoners from Lwów; |
| 3. | October 1942 | — 60 prisoners from Pawiak prison in Krakow; |
| 4. | November 22, 1942 | — 70 prisoners from a prison in Tarnow; |
| 5. | December 5, 1942 | — 49 prisoners from Warsaw; |
| 6. | Late December 194 | — 70 prisoners from Warsaw; |
| 7. | December 1942 | — 150 prisoners from Tarnow |
| 8. | December 13, 1942 | — 16 prisoners from Tarnow; |
| 9. | December 31, 1842 | — 9 prisoners from Montelupich. |

(Zabieroski, Govt. Ex. 174 at 65 (English Translation)). By the end of 1942, approximately 1500 prisoners had arrived.

After each new prisoner transport arrived, the prisoners were shorn, photographed, and deloused. During the first period the prisoners wore their own clothing, but during the second period they surrendered their clothing at the warehouse and they were given camp clothing that had once been worn by Jewish prisoners. In winter, they received overcoats that had belonged to murdered Soviet prisoners of war.

After they changed clothing, the prisoners' names were entered in the register and their biographical information taken. Prisoners were then given numbers in place of their names.

From the outset the prisoners' clothing bore the letter P and their camp number. These designations were worn on the left breast and right shoulder blade area, as well as on jackets and coats and also on the right trouser leg. The letter P was 15 centimeters tall and three centimeters thick, and was applied in oil paint. the trousers also had yellow stripes. The number was painted in red on white cloth. . . .

In Pustkow, prisoners wore red, green, black and white triangles. The red triangle identified a political prisoner. . . . The

black triangle identified prisoners sent to the camp for violating regulations.... The green triangle identified prisoners who had broken the law, and included thieves, murderers, hoodlums, and also black marketeers, as well as those who slaughtered cattle and hogs without permission.... Anyone whose reason for being sent to the camp could not be determined by the camp leadership continued to wear a white triangle. Prisoners who had attempted to escape also wore a red and white bull's eye target on their breast and back.

(Zabierowski, Ex. 174 at 116–17 (English translation)).

The entire camp admittance ceremony was accompanied by beatings, abusive language, and vulgarity. Conditions for the Polish prisoners at Pustkow were cruel and inhumane and only slightly better than those afforded Jewish inmates.

The history of conditions for Poles in this camp can generally be broken into two periods: The first lasted from September 16, 1942, until the end of March 1943, and the second from April 1943 until the camp was evacuated on July 27, 1944. During both periods, the prisoners received starvation rations and slept in unheated barracks. By the end of 1942, prisoners were dying *en masse* from murder, abuse, starvation, and typhus. Corpses piled up faster than they could be disposed of. By March 1943, of the approximately 1500 prisoners that had arrived between September 16, 1942 and January 1, 1943, more than 900 had died as a result of disease, exhaustion, or murder. In January 1943, after an inspection by Commandant Voss, further transports of Polish prisoners into Pustkow were halted until April of that year. Afterwards:

> [t]he camp began to be adapted to human needs. The barracks were weatherproofed by covering the walls with a second layer of boards, and insulated using moss. Deal board floors were laid, and windows installed. Inside the barracks, the two-tiered shared bunks were replaced by three-tier bunks that slept one to a bed. The prisoners received mattresses, blankets and pillows, which they did not have previously. A bathhouse with showers was built, and the prisoners received a weekly shower and a change of clothing. Lavatories were installed in the barracks and two latrines were constructed.

Zabierowski, Govt. Ex. 174 at 68. Although the physical accommodations improved, the treatment of prisoners remained brutal during the second period. Prisoners continued to be beaten, hanged, and shot on a routine basis. Punishment for infractions, real or imagined, were severe and without recourse. Former prisoners described daily incidents of routine punishment that included flogging, beating, clubbing, stomping, kicking, stabbing, torture, hanging, and shooting. On average, at least two prisoners died each day during the second period and, in all, about 40 percent of the Polish prisoners who arrived at Pustkow did not survive their stay.

### DISCUSSION AND FURTHER FINDINGS OF FACT

The burden of proof in a case like this should be and is high. To strip someone of citizenship is a grave and serious matter and should be done only where the evidence presented by the government is clear and unequivocal. *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981); *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943). Because of the enormous consequences that attach to denaturalization, the burden of proof is very close to that required in a criminal case—proof beyond a reasonable doubt. *Klapprott v. United States,* 335 U.S. 601, 611–612, 69 S.Ct. 384, 389, 93 L.Ed. 1099 (1949).

To see the United States government uncoil its mighty sinews and reach across time and distance to uncover facts is an amazing and frightening thing to behold. Indeed, seeking to discover the acts of a single individual across the temporal expanse of fifty years and a distance of an ocean and half a continent is a daunting task. Yet, through the efforts of the Justice Department and the international community, the activities of Wachmann Hajda have come to light. The government believes that the investigation

has also demonstrated that the Defendant is Wachmann Hajda.

In circumstances such as this, when the facts that underlie the government's case are so difficult to obtain, the accused is at a substantial disadvantage in trying to find and develop facts that are exonerating. In such a case, the government has a special responsibility to make available to the accused, all relevant information, whether damning or exculpatory. This Court is satisfied that the Government has done so in this case.

The documentary evidence presented by the Government is overwhelming. A person with (or using) the same name, birth date, birth place, occupation, nationality, citizenship, and general physical description as Defendant, and having parents of the same name as Defendant's did, in certain fact, serve as an auxiliary guard in units at Trawniki, Treblinka, and in the SS Battalion Streibel. That same person unquestionably participated in the massacre of Jewish prisoners at Treblinka. Such evidence, along with the Agreed Facts, is sufficient to establish clearly and unequivocally that Wachmann Hajda and Defendant are one and the same.

## I. DISCREPANCIES IN PHYSICAL DESCRIPTION

There are two overt discrepancies between the description of Wachmann Hajda and Defendant—height and hair color. As to Defendant's hair color, the court notes that, although Defendant's hair color at present is dark brown or black, Defendant's discharge documents from the service of the United States Army in Germany describe Defendant's hair color as "blond." Whether Defendant's hair becomes lighter after exposure to the sun or otherwise, it is clear that it was reasonable to have concluded in the 1940's that Defendant's hair was blond. As to the height discrepancy—173 centimeters versus 165 centimeters—this court has examined the translated versions of the German personnel documents in which the physical description of guard recruits was recorded. The personnel form asks for the identification of the documents from which the information was obtained; if that information is not provided, the form contains the following

advisement, "recorded from the person's own statements." It is reasonable to infer from reading such forms that information about physical description could be, and often was, self-reported. (*See* Govt. Exs. 17–25). One discrepancy as to what might be a self-reported description is not sufficient to overcome the match between all of the other information in the personnel records of Wachmann Hajda and the Defendant's information.

Defendant also alleges a discrepancy in the identities of himself and Wachmann Hajda based upon Defendant's assumption that Wachmann Hajda bore an SS tattoo. Defendant asserts, without any supporting evidence, that all members of the SS had tattoos. Defendant does not have a tattoo. Dr. Sydnor, a noted historian of the Holocaust, testified at trial that tattooing was a ritual performed by members of regular SS units. He noted that while members of auxiliary units serving in Germany may have participated in that ritual, there is no evidence of regular tattooing of auxiliary unit personnel serving elsewhere. The court concludes therefore that there are no significant discrepancies between the physical descriptions of Wachmann Hajda and Defendant.

## II. DEFENDANT'S DESCRIPTION OF EVENTS AT PUSTKOW

It is difficult to reconcile Defendant's recollections of Pustkow with the grisly description of Pustkow contained in the Zabierowski book. Defendant recalls seeing dead bodies on only a few occasions. Corpses were a fact of every day life at Pustkow. Even if Defendant arrived there during the second period, death and dying were still pervasive. The Zabierowski book does report an incident involving an escaped prisoner that matches Defendant's recollection of the dead body of a prisoner being propped up in a chair for the returning prisoners to see. However, Dr. Sydnor testified that this was a common way to discourage escape attempts and that similar displays were made at other camps. Moreover, the Defendant acknowledged reading an article about Pustkow. This incident may have been reported in that article. It is possible, if not likely, that Defendant

learned of this incident, as well as the Blizna accident, through reading published materials about the war.

Defendant also testified that he never saw a prisoner punished or beaten at Pustkow. This assertion is completely inconsistent with every account of the Pustkow Labor Camp. Pustkow was a violent, brutal place where Polish, Jewish, and Soviet prisoners were beaten, shot, and mangled for the slightest infraction. It is unlikely, if not impossible, that Defendant was at Pustkow and failed to see punishment administered.

## III. PUSTKOW & STANISLAW SWIE-CHOWICZ

Defendant claims that, while at Pustkow, he saw Stanislaw Swiechowicz, whom he had known from Jordanov. According to Defendant, Swiechowicz approached him and said "Bruno" and the Defendant said "Stashnik." He saw Swiechowicz one other time. This testimony is at odds with Defendant's deposition testimony, where he said that he had not known Swiechowicz in Jordanov, and that they met at Pustkow when Swiechowicz approached him and told Defendant that he was from Jordanov. This deposition testimony is also at odds with the deposition testimony of Swiechowicz, who said that he had known Defendant in Jordanov and that they had gone to school together. Swiechowicz testified that he had been unable to talk to Defendant on that occasion or on other occasions when he saw Defendant because there were guards nearby and talking was prohibited.

Swiechowicz did testify to seeing Defendant at Pustkow, however the discrepancies between his and Defendant's accounts seriously undermine Swiechowicz's credibility. In addition, it should be noted that Swiechowicz currently lives next door to Hajda's brother Wladyslaw and sister-in-law Helena, and that Swiechowicz's decision to come forward and testify was sealed over a bottle of Vodka.

Defendant's description of his original meeting with Swiechowicz is doubtful for two additional reasons. Defendant described Swiechowicz as wearing striped prisoner clothing. Swiechowicz testified that he was not a prisoner and that he wore solid white kitchen clothing. Finally, Defendant's description of the greeting between himself and Swiechowicz raises questions. At his original interview with counsel for the Government, Defendant was asked whether he had ever gone by the name "Bruno." His response was "Oh, yeah Bruno. Because when I came here first, I couldn't speak any English. So they took me where you get a Social Security, and the people who gave it to me, they put the name, Bruno. And then I asked when I came to get papers, citizenship papers, that it was like that, and they said its not important, because it is the same thing." It reasonable to infer from that answer that Defendant did not use the name Bruno before coming to the United States and therefore it is not likely that Swiechowicz would have greeted him by that name in 1943 or 1944.

Finally, Defendant's description of the clothing at Pustkow and the markings thereon varies substantially from the detailed description of Pustkow prisoner garb described by Zabierowski. Defendant made no mention of the different colored triangles, the letter "P" or the bulls eye worn by prisoners who had attempted escape. The Court therefore concludes that the testimony of Swiechowicz and Defendant about their meeting in Pustkow is not credible.

## IV. DRESDEN

Defendant did not recall when he left Pustkow, except that it was cold. He remembered that there were other prisoners at Pustkow when he left. He left by train and eventually arrived in Germany, near Dresden. He was uncertain as to how long the trip took, but stated it could have taken as long as five months. He arrived near Dresden either two weeks before the fire-bombing of that city or approximately two weeks after the bombing, or perhaps during the bombing.

The timing of his departure from Pustkow and arrival at Dresden is important in assessing Defendant's story. Pustkow was evacuated in late July 1944. The Anglo–American fire-bombing of Dresden occurred in mid–February 1945. If there were prison-

ers at Pustkow when Defendant left, then his departure was before July 22, 1943. In his deposition, Defendant said that the trip from Pustkow to Dresden took only three to four days, and that the train stopped only in the station. At trial, he said that the trip could have taken several months. The court finds that a trip of several months' duration was highly unlikely and Defendant's account of these events is not credible.

## V. KAZIMIERA MROZINSKA (FORMERLY KAZIMIERA HAJDA)

Defendant's sister, Kazimiera Mrozinska, testified by way of deposition, that during or after the war, her father told her that Defendant had been imprisoned in Pustkow. The documentary evidence shows after the war ended, Kazimiera, Stanislaw (Defendant's father), and Zofia (Defendant's mother) were tried for collaborating with the occupation forces. The charges grew out of the family's relationship with Emil Wilczek, a Polish policeman who worked with the SS and Gestapo during the occupation and was later murdered by Polish partisans. The Defendant was not charged in these proceedings and apparently was not in Jordanov when the events involving the charges took place. In her statement to the authorities given during those proceedings, Kazimiera denied involvement with Wilczek and concluded by stating, "[M]y brother served in the German military, in the SS." Indeed, her father also stated to the authorities, "[M]y son Bronislaw Hajda went to Germany to join the SS."

Defendant argues that the post-war statements of Kazimiera and Stanislaw are unreliable because they were given as a result of coercion. The evidence of coercion could be inferred from several documents. The first is a letter dated January 27, 1942 from Kazimiera to the Prosecutor of the Special Criminal Court in Krakow, wherein she says that she has been in prison for a year without having been questioned and that the charges are groundless. Defendant also submitted a letter dated February 14, 1946 from Dr. Kremer to the special Court in Krakow. Kremer was a lawyer and the public defender assigned to represent Stanislaw, Kazimiera, and Zofia. His letter merely asserts

their innocence. Finally, Defendant submitted correspondence from the Deputy Prosecutor dated April 23, 1945, requesting that the investigation involving Kazimiera be expedited because she had been in jail since February 26, 1945. Whatever else can be said about the legal process involving the charges against members of the Hajda family, justice was not swift. Eventually, all were exonerated although there was testimony tending to support the accusations against them. This court does not conclude, as Defendant suggests, that the fact that the authority was Communist or that Kazimiera was in jail for a prolonged period, means that her statement about Defendant is unreliable. None of the documents establishes coercion. There was no incentive for Kazimiera to say that her brother collaborated with the Germans. Defendant was not a party to the proceedings, nor was he ever in Poland. The charges had nothing to do with him. Why it would benefit a family accused of collaborating with the Germans to say that their relative collaborated with the Germans is a mystery.

Finally, as to Kazimiera's 1945 signed statement, Defendant would have this court infer from the compression of the lines in which the reference to Defendant is made, that the document has been altered. There are several plausible, innocuous explanations for the appearance of the document; this court thus declines to accept Defendant's explanation. The court concludes that Kazimiera's statement that her father told her that Defendant was imprisoned at Pustkow is not believable and that her statement made in 1945 that he worked with the SS during the war is credible. Similarly, the court credits the statement of Stanislaw Hajda that his son had gone to join the SS.

## VI. EXPLANATION OF SIMILARITY IN DESCRIPTION

Finally, Defendant suggests that an imposter may have stolen Defendant's identity and served as a Trawniki man. As one explanation as to how this could happen, Defendant claims that when he was arrested on the train to Warsaw, the Gestapo kept his identity papers. Implicit in this argument is

the fact that all of the information in Wachmann Hajda's personnel file was contained in the identity papers. But even if that were the case, at his initial interview on January 29, 1993, Defendant surmised that he was arrested because he did not have the correct papers, he only had a paper saying that he was an apprentice shoemaker. At his deposition on December 15, 1994, Defendant testified that on the train, he had an identification card and an apprenticeship card when he was arrested. In light of these inconsistencies, it would be pure speculation to conclude that the Gestapo had reason to create a false Bronislaw Hajda especially where, as here, the alleged Gestapo imposter wound up in a ragtag construction unit fleeing the Soviet Army in disarray.

■ Based on the foregoing, this court concludes that Wachmann Hajda and Defendant are one and the same and that Defendant intentionally misrepresented his activities from January 1943 through April 1945 in order to obtain entry into the United States. In particular, Defendant was not a person who was "the concern" of the International Relief Organization pursuant to 62 Stat. 3037–3055. Defendant's service as an auxiliary in the guard units at Training Camp Trawniki, his assistance in the murder of 300 to 700 Jewish prisoners at Treblinka, his service as an armed guard at Treblinka, and his service in the SS Battalion Streibel, all constituted assistance in the persecution of civil populations within the meaning of those terms as used in 62 Stat. 3051, 3052. Defendant was therefore ineligible to receive a visa under the DPA.

■ In addition, Defendant's membership and participation as an auxiliary in the guard units at Training Camp Trawniki, Treblinka Labor Camp, and SS Battalion Streibel constituted membership or participation in a movement hostile to the United States and to the form of government of the United States, and rendered Defendant ineligible to receive a visa under Section 13 of the DPA. Moreover, in seeking a determination from the DPC that he was an eligible displaced person, Defendant misrepresented material facts and necessarily concealed his service in auxiliary guard units at Training Camp Trawniki, the Treblinka Labor Camp, and in SS Battalion Streibel, for the purpose of gaining admission into the United States within the meaning of § 10 of the DPA. Defendant similarly wilfully misrepresented material facts on Form 1–144 within the meaning of § 10 of the DPA.

■ Because Defendant was not eligible to receive a visa under the DPA, his entry into the United States pursuant thereto was unlawful under Section 2(b), Displaced Person Act, 62 Stat. 1009, 1013 (1948). Because Defendant's entry into the United States was unlawful, his subsequent naturalization was unlawful under Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1). Defendant's citizenship was therefore illegally procured and must be revoked, as provided in Section 340(a) of the INA, 8 U.S.C. § 1451(a).

### *Conclusion*

Defendant Bronislaw Hajda intentionally misrepresented material facts in connection with obtaining a visa to enter the United States; therefore his citizenship is revoked, the order admitting him to citizenship is vacated, and Certificate of Naturalization No. 7537428 is canceled.

### *ATTACHMENT "A"*

#### (a) *Statement of Uncontested Issues of Fact and Law*

#### A. *Defendant's Prewar and Wartime Activities*

1. Defendant was born on March 19, 1924 in Jordanów, Myślenice County, Kraków Province, Poland. He attended primary school in Jordanów from 1931–37. Until January 1943, Defendant worked as an apprentice shoemaker, for his father, Stanislau, in Jordanów.

2. In September 1939, pursuant to a secret non-aggression pact, Nazi Germany and the former Union of Soviet Socialist Republics ("U.S.S.R.") invaded Poland, which was subsequently conquered and divided.

3. In October 1939, Kraków Province (renamed Kraków District) became part of the Government General, an area of former Pol-

ish territory occupied by, but not formally annexed to, Germany. Nazi Germany occupied Kraków District until the withdrawal of German forces in January 1945.

4. On June 22, 1941, the war between Nazi Germany and the U.S.S.R. began.

5. The Trawniki Training Camp was a facility established and operated by the German *Schutzstaffel* ("SS") and the German police. The SS was the elite guard and intelligence unit of the Nazi Party of Germany. The purpose of the Trawniki Training Camp was to train men to serve as guards and auxiliary police to assist the SS and police in implementing the Nazi program to annihilate the Jews of Poland and in other Nazi race and settlement projects. The Trawniki Training Camp also served as a base camp for these men, where they were stationed between assignments elsewhere.

6. The *Wachmannschaften* units served the German SS and German police and were supervised by German SS and police personnel. Their members were known, *inter alia*, as "Trawniki men" (*Trawnikimänner*).

7. Trawniki men were regularly paid by the SS and police and granted leave. In addition to wages, Trawniki men were eligible for family support benefits—a specific monthly stipend based on demonstrated need.

8. Though often referred to by their German superiors as well as their Jewish victims as "Ukrainians", and sometimes "Latvians" and "Lithuanians", the Trawniki men included persons of various nationalities, including: Ukrainians, Russians, Belarussians, Poles, Estonians, Lithuanians, Latvians, ethnic Germans from Ukraine and the Volga German Republic of the USSR, Kazakhs, and Tartars.

9. Under standard procedures, Trawniki men signed a statement committing themselves to serve in the guard units at Trawniki for the duration of the war.

10. Under the direction of the SS and Police Leader for the District of Lublin in occupied Poland, the Trawniki men assisted in *Aktion Reinhard* ("Operation Reinhard"), the Nazi project whose ultimate goal was the annihilation of Polish Jewry. Under the aegis of Operation Reinhard, an estimated 1,700,000 Polish Jews were murdered, the labor of able-bodied survivors was ruthlessly exploited in slave labor camps under armed guard, and the personal belongings of the murdered Jews were stolen and distributed to benefit the German economy.

11. Training at Trawniki consisted of military drill, weapons and guard training and learning German commands and marching songs. The Trawniki men were trained for police duty, guard duty, and prisoner transport escort work, skills which they applied in implementing "Operation Reinhard."

12. In late 1942, the Germans established a forced labor camp for Jews adjacent to the Trawniki Training Camp. This forced labor camp was known as the "Trawniki Labor Camp."

13. From the time its first Jewish prisoners arrived in Autumn 1942 until all but a few were murdered as part of Operation Erntefest (Harvest Festival) in early November 1943, the SS Labor Camp at Trawniki was guarded by Trawniki-trained guards. Even those recruits assigned to full-time staff duty in the Training Camp were deployed, from time to time, as guards on the perimeter of the Labor Camp.

14. The SS Labor Camp at Treblinka, officially known as "the SS and Police Leader Warsaw, Labor Camp Treblinka," located in Sokolow County in Warsaw District, Poland was located near the Treblinka Death Camp; the two camps together comprised the "Treblinka complex."

15. The Trawniki men at the Treblinka Labor Camp, armed with rifles, guarded the perimeter of the camp against prisoner escapes and guarded the prisoners en route to and from the slave labor sites and at the sites themselves.

16. Most of the Jewish prisoners sent to the Treblinka complex arrived at the Treblinka Labor Camp as a result of deportations under the aegis of Operation Reinhard. These Jews had been seized and deported from their homes to be murdered at the gas chamber at Treblinka Death Camp solely because they were Jewish and, as such, were

deemed to be members of an inferior race implacably hostile to Germany. A small number of those deemed physically able for forced labor or possessing certain skills were sent to the Labor Camp to be killed through work.

17. Hundreds of non–Jewish Polish prisoners, including political prisoners and those who violated German occupation decrees, were sent to the Treblinka Labor Camp as well.

18. One of the purposes of the Treblinka Labor Camp was to work the prisoners to death. This purpose was explicitly communicated to both the Trawniki guards and the prisoners.

19. Much of the labor performed by the prisoners at Treblinka Labor Camp was exceedingly strenuous. One prisoner detachment, using hand shovels, filled between six and eight railcars with sand and gravel each day for shipment to Trawniki, Lublin and other locations. Other prisoner crews cut timber in the nearby forests and hauled it to the wood storage area for camp use or to the rail spur for shipment outside the area. The largest prisoner detachment was assigned to the Malkinia railroad station, where the prisoners either unloaded coal and other goods from incoming trains or repaired or constructed rail track. Still other prisoner detachments were deployed in small-scale agricultural production. During the summer months, prisoners worked on water regulation projects at sites along the Bug River, some five miles from the Treblinka Labor Camp.

20. Prisoners at the Labor Camp were forced to work year-round regardless of the weather and worked six days a week from early morning until evening.

21. Food rations for prisoners at the Labor Camp were completely inadequate and generally consisted of thin soup and small amounts of bread for dinner. Medical care of prisoners was virtually nonexistent.

22. Severe brutality was the norm; the prisoners of the Treblinka Labor Camp were frequently shot, hanged, beaten or stabbed to death by German SS and police and by Traw-

niki men. On a number of occasions, prisoners were killed by Trawniki men at the camp, at nearby woods, and at work sites. Those prisoners who collapsed during work were often beaten or stabbed to death on the spot in front of the other prisoners by Trawniki men. Those too weak to work at the end of the day were, under a standing order, murdered at a killing site by German SS and police or, in other instances, by Trawniki men. Prisoners who attempted or planned escapes were shot or otherwise killed.

23. Occasionally, large groups of sick or weak prisoners from the Treblinka Labor Camp were sent to the Treblinka Death Camp to be murdered in the gas chambers.

24. On or about July 23, 1944, as the Soviet army approached Treblinka, German SS and police and Trawniki men took nearly all the remaining Jewish prisoners (between 300 and 700 prisoners) to a nearby forest where a killing site had been prepared by digging large pits to serve as mass graves. There, the prisoners were shot to death by German SS and police and by Trawniki men assigned to the Treblinka Labor Camp.

25. Immediately prior to the July 23, 1944 killing action, each Trawniki man was issued ammunition. The perimeter guard of Trawniki men was doubled, and guards were posted along the edge of the site in the wooded area where the killings were to take place. In addition, Trawniki men cordoned off the perimeter of the Jewish camp, patrolled inside the camp, and escorted the prisoners to the murder site.

26. The remaining Jewish prisoners were assembled in formation in the inner camp and forced to lie face down on the ground, guarded by German SS and police and Trawniki men. In groups of 15 to 20, the Jewish prisoners were led to the woods by German SS staff and the Trawniki men. Trawniki men lined the path to the murder site. To further hinder escape attempts, the prisoners were forced to drop their pants to their knees and walk with raised arms. Those prisoners who nevertheless attempted to escape were shot to death. Those who marched on to the murder site were ruthlessly beaten. Trawniki men participated in the

mass killing by shooting into the pits and at those attempting to escape.

27. All Trawniki men were on duty that day, and were present at, and participated in, this operation.

28. The majority of the prisoners who came to the Treblinka Labor Camp between March 1943 and July 1944, including virtually all of the Jews, died there; many prisoners did not survive longer than a few months.

29. In July 1944, SS Training Camp Trawniki units evacuated the SS Training Camp Trawniki and other locations in Eastern Poland where Trawniki men served. These units were reformed and renamed the "SS Battalion Streibel." After participating in the liquidation of Treblinka Labor Camp, the Trawniki-trained guard unit there joined its parent unit, the SS Battalion Streibel, in or about August 1944.

30. In early August, 1944, the SS Battalion Streibel established a Special Staff headquarters in Jedrzejów, located in Radom District, 105 miles southwest of Lublin, where it remained until at least mid–December of that year. The SS Battalion Streibel staff initially established headquarters in Zlota, 19 miles southeast of Jedrzejów, and remained there until at least early November. In late November or December, the SS Battalion Streibel headquarters moved to Pińczów, 13 miles southeast of Jedrzejów.

31. Between August 1944 and January 1945, members of the SS Battalion Streibel forced tens of thousands of Polish civilians into labor service. Those Polish civilians who resisted such forced labor service were shot on the spot or arrested and incarcerated in labor camps by members of the SS Battalion Streibel.

32. Between August 1944 and January 1945, members of the SS Battalion Streibel guarded tens of thousands of Polish civilian forced laborers. These forced laborers were compelled, under armed guard, to construct fortification sites in central Poland.

33. In the wake of the Soviet offensive of January 1945, the SS Battalion Streibel retreated westward, reforming in and around Dresden, Germany in early February 1945.

34. In Dresden, the SS Battalion Streibel cleared rubble caused by the massive Allied air raids on that city in mid–February, 1945.

35. A forced labor camp, known to its Jewish and Polish inmates as "Camp Pustków," was located on the grounds of the SS–Truppenübungsplatz Debica (SS Troop Training Base Debica), which was renamed SS–Truppenübungsplatz Heidelager in 1944. Base Debica was located near the Polish city of Debica, in Kraków District (66 miles east of Kraków).

36. The labor camp Pustkow derived its name from the village of Pustków, located on the base near the Kochanówka railroad station.

37. The International Refugee Organization (IRO) was established in January 1948 and was responsible for the care of the approximately 1,200,000 remaining World War II refugees in Europe. The IRO provided services to refugees and displaced persons and assisted them in either repatriating to their countries of origin or resettling in different countries.

38. In order to be eligible for IRO services a person had to be "of concern" to the IRO. Annex I, Part I of the IRO Constitution defined persons who would be "of concern" to the IRO and included displaced persons. A displaced person was defined as a person who had been deported from or had been obliged to leave his country of nationality or of former habitual residence, such as persons who were compelled to undertake forced labour or who were deported for racial, religious, or political reasons.

39. Part II of Annex I of the IRO Constitution defined categories of persons who were not "of concern" to the IRO including persons who assisted the enemy in persecuting civil populations.

40. Between 1947 and 1948, the IRO created a Manual for Eligibility Officers, co-authored by Michael Thomas, to be used by IRO eligibility officers to achieve uniformity in eligibility determinations. The manual was mandatory and binding on all eligibility officers. Among other things, the manual

contained a partial listing of wartime *SS* formations and their known wartime positions.

41. In order to apply for IRO services, an applicant would provide information specified on the "CM–1" form which requested personal information including name, place of birth, family unit, information regarding when and how the applicant came into Germany, places the applicant had lived in Germany, the type of identity documents the applicant possessed, schooling and general health questions.

42. The CM–1 form requested information about an applicant's wartime whereabouts and activities in detail. Such information was very important in determining an applicant's status.

43. Information on the CM–1 form was obtained from the applicant. Applicants were interviewed in the presence of interpreters when necessary to complete the form and/or to ensure the data on the form was correct. The IRO eligibility officer generally recorded information provided by the applicant on the CM–1 form. If an applicant disclosed any information during the interview which raised any suspicion regarding eligibility, further investigation would be conducted.

44. Determinations of eligibility were made by IRO eligibility officers. The principal job of eligibility officers was to determine whether an applicant was eligible for IRO assistance.

45. If a refugee indicated that he did not wish to return to his country of nationality he would fill out and sign a resettlement form, which was also known as a *Fragebogen.*

46. It was an applicant's burden to establish that he was "of concern" to the IRO and eligible for displaced person status. An IRO determination of eligibility was a prerequisite to resettlement in the United States under the DPA.

47. An applicant who, as an SS auxiliary, served as an armed guard of civilians imprisoned at Trawniki Labor Camp would not have been "of concern" to the IRO and, therefore, would have been ineligible for IRO assistance.

48. An applicant who as an SS auxiliary, served as an armed guard of civilians and/or participated in the liquidation of the Jewish prisoners at Treblinka Labor Camp would not have been "of concern" to the IRO and, therefore, would have been ineligible for IRO assistance.

49. An applicant who, as a member of the SS Streibel Battalion, forced Polish civilians into labor service and/or acted as an armed guard of these forced laborers would not have been "of concern" to the IRO and, therefore, would have been ineligible for IRO assistance.

50. Defendant applied for IRO assistance and in or around January 1950 and based on information provided by Defendant was found to be of concern to the IRO and eligible for IRO assistance.

51. The Displaced Persons Commission (DPC) was a presidentially appointed Commission charged with processing applicants for displaced persons status and admission into the United States. The DPC administered the DPA, including screening applicants for immigration under that act. The goal of the DPA was to aid the resettlement of innocent victims of World War II who had been driven from their homes. There were far more applicants for immigration to the United States than there were available spaces.

52. DPC analysts reviewed all of the documentation concerning each applicant to determine the applicant's eligibility and desirability to enter the United States.

53. In determining the eligibility of an applicant to enter the United States, standard procedure called for DPC Case Analysts to review the file of an applicant which included information received from the applicant as well as information received from the United States Army Counter Intelligence Corps (CIC) and other agencies. DPC Case Analysts did not interview the applicants. The DPC referred cases to the CIC to conduct further investigation and interview applicants.

54. Military investigators for the CIC investigated and interviewed applicants and prepared written reports about their backgrounds, including information about anything derogatory, such as their wartime activities, which would call into question their eligibility for Displaced Person status and thus their subsequent immigration into the United States.

55. When the CIC received a DPA application, the CIC conducted checks, where possible, with local police forces and other record-keepers for any available information reflecting adversely on the applicant. As part of the investigative process, the CIC made name check requests to the Berlin Document Center which held a certain number of captured German Army and SS personnel records.

56. Pursuant to standard operating procedures, CIC investigators interviewed the applicant and the applicant's references. If the applicant or his references did not speak English, an interpreter capable of communicating in the applicant's or references' native language was used. Standard operating procedure called for applicants of a certain age and background to be questioned about their wartime activities.

57. At the end of the investigation, a CIC investigator completed a report or worksheet, which highlighted any derogatory information found regarding the applicant, and turned it in to the CIC Headquarters Section of the visa screening team. The report or worksheet was then reviewed by a superior officer, retyped, returned to the investigator for his signature, and forwarded to the DPC. CIC investigators did not make decisions about eligibility, they only provided information to the DPC.

58. In or around the end of April 1950 a CIC report was prepared regarding Defendant Bronislaw Hajda.

59. A principal concern of CIC investigations was evidence of membership or participation in a movement hostile to the United States during the Second World War. If, during the course of an investigation, evidence was uncovered that an applicant had been involved with a movement hostile to the United States, the CIC focused the investigation on substantiating or refuting the evidence and on determining the extent of the applicant's participation in any such activities. If it was determined that the applicant had indeed been a member of or participated in a movement hostile to the United States but had kept this fact hidden, or had failed to bring it to the investigator's attention during an interview, the investigator would have noted this fact in the report.

60. After receiving the CIC report and reviewing the information contained in an applicant's file, DPC Case Analysts prepared a report of their findings regarding each applicant. Under standard procedure, a DPC Case Analyst would list all material facts including any derogatory information in the report.

61. Section 10 of the Displaced Persons Act required a DPC report on each applicant, and such reports were regularly completed as records of the DPC.

62. Under Section 2(b) of the Displaced Persons Act, a person must have been "of concern" to the International Refugee Organization (IRO) to have been eligible for admission to the United States. A person who was not "of concern" to the IRO was not eligible for admission to the United States under the DPA.

63. Under Annex I, Part II of the IRO Constitution an applicant who was found to have assisted the enemy in persecuting civilian populations were not "of concern" to the IRO. Thus, such persons were not eligible for admission to the United States under the DPA.

64. Under Section 13 of the Displaced Persons Act, a member of, or a participant in, a movement hostile to the United States or to the form of Government of the United States, was ineligible for admission to the United States.

65. Under Section 10 of the Displaced Persons Act, an applicant who willfully misrepresented material facts for the purpose of gaining admission to the United States was ineligible for admission to the United States.

66. The fact that an applicant as an SS auxiliary served as an armed guard of civilians imprisoned at Trawniki Labor Camp would have been considered a material fact under the DPA.

67. The fact that an applicant as an SS auxiliary served as an armed guard of civilians and/or participated in the liquidation of the Jewish prisoners at Treblinka Labor Camp would have been considered a material fact under the DPA.

68. The fact that an applicant as a member of the SS Streibel Battalion forced Polish civilians into labor service and/or acted as an armed guard of those forced laborers would have been considered a material fact under the DPA.

69. The duties of a United States Vice Consul serving in Stuttgart, Germany in 1950 included the issuance or rejection of immigration visas to applicants including displaced persons who sought to enter the United States under the Displaced Persons Act of 1948.

70. If the DPC determined that an applicant was not eligible for a visa under the Displaced Persons Act, the applicant would be rejected and the application would never reach a Vice Consul. If the DPC determined that the applicant was eligible, the applicant's file would be sent to the visa issuing office. The determination of the DPC that an applicant was eligible was not binding, and Vice Consuls made independent determinations as to whether an applicant was eligible for a visa.

71. Vice Consuls followed standard operating procedures for reviewing visa applications. These procedures were used throughout Germany and were established in 1949 when the Displaced Persons Program was initiated.

72. Vice Consuls studied each application in preparation for the personal interview with an individual applicant or family group. A personal interview was required of all applicants. Vice Consuls had the paperwork from all of the agencies with whom the applicant had dealt in applying for a visa and all other other required supporting documentation including the IRO application, the DPC report, the medical examination(s), security reports, proof of future place of residence in the United States, and the visa application.

73. Vice Consuls personally interviewed visa applicants. If the applicant was not able to communicate in English, the interview was conducted with the assistance of an interpreter qualified in both English and in the native language of the applicant. Vice Consuls reviewed the visa application orally with the applicant.

74. Vice Consuls were particularly interested in the applicant's claimed places of birth and residence as well as their wartime activities. Vice Consuls routinely asked applicants about their wartime activities and whether they worked with or for the Germans during the war.

75. Before issuing visas, Vice Consuls would have the applicant swear to the truth of the statements made in the written visa application and orally during the interview.

76. Applicants who misrepresented material facts about their wartime activities and whereabouts were ineligible for visas under § 10 of the DPA.

77. In early 1950, Defendant sought a determination from the United States Displaced Persons Commission ("DPC") that he was a Displaced Person as defined in the Displaced Persons Act of 1948, Pub.L. No. 80–774, ch. 647, 62 Stat. 1009 ("DPA") and therefore eligible to immigrate to the United States.

78. The February 7, 1950, DPC case analyst's report regarding Defendant states that from 1937 to January 1944 Defendant resided with his parents in Jordanów, Poland, where he was employed as a shoemaker, and that "in January 1944 he entered Germany at Dresden and was kept there to May 1945."

79. In or about April 1950, an agent of the U.S. Army CIC interviewed Defendant.

80. The CIC report based on that interview states that from 1937 until November 1943, Defendant was an "apprentice shoemaker" in Jordanów, Poland; that from November 1943 until January 1944, he was in "Straflager [Penal Camp] Poztkum, Poland";

that he was "brought" to Dresden, Germany in January 1944; and that from January 1944 until April 1945 he was in the "Straflager [Penal Camp] Dresden." The report also states that he had "no political affiliations."

81. The CIC documents pertaining to the CIC investigation of Bronislaw Hajda are the type of documents regularly prepared and kept by the CIC as part of the investigation of applicants.

82. In May 1950 the DPC found Defendant eligible for visa consideration as a Displaced Person.

83. On May 24, 1950, Defendant applied for an immigration visa to enter the United States by submitting an Application for Immigrant Visa and Alien Registration (Form 256a), No. I–1197028, (hereinafter "visa application") to the American consulate in Stuttgart, Germany.

84. On May 24, 1950, Defendant was interviewed by a Vice Consul and swore to the truth of the information on his visa application.

85. Based upon the information Defendant provided to United States authorities, Defendant's visa application was granted, and a United States immigrant visa was issued to Defendant as a Polish national under the DPA on May 24, 1950.

86. To gain admission to the United States, on June 24, 1950, Defendant executed an Affidavit as to Subversive Organizations or Movements (Form I–144), which stated that he was not and had never been "a member of or participated in any movement which is or has been hostile to the United States or the form of government of the United States" and that he had "never advocated or assisted in the persecution of any person because of race, religion, or national origin."

87. Defendant entered the United States at New York, New York on or about June 24, 1950.

88. In or about September 1955, Defendant applied with the U.S. Immigration and Naturalization Service (hereinafter "INS") for naturalized United States citizenship.

89. On November 29, 1955, the United States District Court for the Eastern District of Michigan granted Defendant's Petition for Naturalization and issued him Certificate of Naturalization No. 7537428.

*Agreed Issues of Law*

1. Service in the SS auxiliary guard units at the SS Training Camp Trawniki, or as an armed guard at the Treblinka Labor Camp, or in the SS Battalion Streibel constitutes assistance in persecution of civil populations and renders an individual ineligible to receive a visa under the DPA.

2. Service in the SS auxiliary guard units at the SS Training Camp Trawniki, or as an armed guard at the Treblinka Labor Camp, or in the SS Battalion Streibel constitutes membership or participation in a movement hostile to the United States or to the form of government of the United States and renders an individual ineligible to receive a visa under the DPA.

3. Service in the SS auxiliary guard units at the SS Training Camp Trawniki, or as an armed guard at the Treblinka Labor Camp, or in the SS Battalion Streibel constitutes material facts with respect to a determination from the Displaced Persons Commission that an individual is an eligible Displaced Person and thus eligible for United States visa consideration.

4. Service in the SS auxiliary guard units at the SS Training Camp Trawniki, or as an armed guard at the Treblinka Labor Camp, or in the SS Battalion Streibel constitutes a material fact with respect to a determination from consular officials that an individual is eligible for a United States visa.

**(b)** *Agreed Statement of Contested Issues of Fact and Law*

1. Whether, between January 9, 1943 and April 1945, the Defendant served as an SS auxiliary at Training Camp Trawniki; or as an armed guard at and/or participant at the liquidation of Treblinka Labor Camp; or as a member of the SS Streibel Battalion.

2. Whether the Defendant, Bronislaw Hajda, is the same man named on German personnel rosters identified as Government Exhibits 1, 1a, 2, 3, 4, 5, 6, and 7.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

UNITED STATES of America, Plaintiff,

v.

Bronislaw HAJDA, Defendant.

Civil Action No. 94 C 5174.

COAR, District Judge.

*ADDITIONAL AGREED FINDINGS
OF FACT*

1. The International Refugee Organization (IRO) was established in January 1948 and was responsible for the care of the approximately 1,200,000 remaining World War II refugees in Europe. The IRO provided services to refugees and displaced persons and assisted them in either repatriating to their countries of origin or resettling in different countries.

2. In order to be eligible for IRO services a person had to be "of concern" to the IRO. Annex I, Part I of the IRO Constitution defined persons who would be "of concern" to the IRO and included displaced persons. A displaced person was defined as a person who had been deported from or had been obliged to leave his country of nationality or of former habitual residence, such as persons who were compelled to undertake forced labour or who were deported for racial, religious, or political reasons.

3. Part II of Annex I of the IRO Constitution defined categories of persons who were not "of concern" to the IRO including persons who assisted the enemy in persecuting civil populations.

4. Between 1947 and 1948, the IRO created a *Manual for Eligibility Officers*, co-authored by Michael Thomas, to be used by IRO eligibility officers to achieve uniformity in eligibility determinations. The manual was mandatory and binding on all eligibility officers. Among other things, the manual contained a partial listing of wartime *SS* formations and their known wartime positions.

5. In order to apply for IRO services, an applicant would provide information specified on the "CM–1" form which requested personal information including name, place of birth, family unit, information regarding when and how the applicant came into Germany, places the applicant had lived in Germany, the type of identity documents the applicant possessed, schooling and general health questions.

6. The CM–1 form requested information about an applicant's wartime whereabouts and activities in detail. Such information was very important in determining an applicant's status.

7. Information on the CM–1 form was obtained from the applicant. Applicants were interviewed in the presence of interpreters when necessary to complete the form and/or to ensure the data on the form was correct. The IRO eligibility officer generally recorded information provided by the applicant on the CM–1 form. If an applicant disclosed any information during the interview which raised any suspicion regarding eligibility, further investigation would be conducted.

8. Determinations of eligibility were made by IRO eligibility officers. The principal job of eligibility officers was to determine whether an applicant was eligible for IRO assistance.

9. If a refugee indicated that he did not wish to return to his country of nationality he would fill out and sign a resettlement form, which was also known as a *Fragebogen*.

10. It was an applicant's burden to establish that he was "of concern" to the IRO and eligible for displaced person status. An IRO determination of eligibility was a prerequisite to resettlement in the United States under the DPA.

11. An applicant who, as an SS auxiliary, served as an armed guard of civilians imprisoned at Trawniki Labor Camp would not have been "of concern" to the IRO and, therefore, would have been ineligible for IRO assistance.

12. An applicant who as an SS auxiliary, served as an armed guard of civilians and/or participated in the July 22, 1944 liquidation

of the Jewish prisoners at Treblinka Labor Camp would not have been "of concern" to the IRO and, therefore, would have been ineligible for IRO assistance.

13. An applicant who, as a member of the SS Streibel Battalion, forced Polish civilians into labor service and/or acted as an armed guard of these forced laborers would not have been "of concern" to the IRO and, therefore, would have been ineligible for IRO assistance.

14. Defendant applied for IRO assistance and in or around January 1950 and based on information provided by Defendant was found to be of concern to the IRO and eligible for IRO assistance.

15. The Displaced Persons Commission (DPC) was a presidentially appointed Commission charged with processing applicants for displaced persons status and admission into the United States. The DPC administered the DPA, including screening applicants for immigration under that act. The goal of the DPA was to aid the resettlement of innocent victims of World War II who had been driven from their homes. There were far more applicants for immigration to the United States than there were available spaces.

16. DPC analysts reviewed all of the documentation concerning each applicant to determine the applicant's eligibility and desirability to enter the United States.

17. In determining the eligibility of an applicant to enter the United States, standard procedure called for DPC Case Analysts to review the file of an applicant which included information received from the applicant as well as information received from the United States Army Counter Intelligence Corps (CIC) and other agencies. DPC Case Analysts did not interview the applicants. The DPC referred cases to the CIC to conduct further investigation and interview applicants.

18. Military investigators for the CIC investigated and interviewed applicants and prepared written reports about their backgrounds, including information about anything derogatory, such as their wartime ac-

tivities, which would call into question their eligibility for Displaced Person status and thus their subsequent immigration into the United States.

19. When the CIC received a DPA application, the CIC conducted checks, where possible, with local police forces and other record-keepers for any available information reflecting adversely on the applicant. As part of the investigative process, the CIC made name check requests to the Berlin Document Center which held a certain number of captured German Army and SS personnel records.

20. The CIC had no access to German wartime documents captured by the Soviet Union. Nor could CIC investigators conduct background investigations in areas occupied by the Soviet Union, including Poland.

21. Pursuant to standard operating procedures, CIC investigators interviewed the applicant and the applicant's references. If the applicant or his references did not speak English, an interpreter capable of communicating in the applicant's or references' native language was used. Standard operating procedure called for applicants of a certain age and background to be questioned about their wartime activities.

22. At the end of the investigation, a CIC investigator completed a report or worksheet, which highlighted any derogatory information found regarding the applicant, and turned it in to the CIC Headquarters Section of the visa screening team. The report or worksheet was then reviewed by a superior officer, retyped, returned to the investigator for his signature, and forwarded to the DPC. CIC investigators did not make decisions about eligibility, they only provided information to the DPC.

23. In or around the end of April 1950 a CIC report was prepared regarding Defendant Bronislaw Hajda.

24. A principal concern of CIC investigations was evidence of membership or participation in a movement hostile to the United States during the Second World War. If, during the course of an investigation, evidence was uncovered that an applicant had been involved with a movement hostile to the

United States, the CIC focused the investigation on substantiating or refuting the evidence and on determining the extent of the applicant's participation in any such activities. If it was determined that the applicant had indeed been a member of or participated in a movement hostile to the United States but had kept this fact hidden, or had failed to bring it to the investigator's attention during an interview, the investigator would have noted this fact in the report.

25. After receiving the CIC report and reviewing the information contained in an applicant's file, DPC Case Analysts prepared a report of their findings regarding each applicant. Under standard procedure, a DPC Case Analyst would list all material facts including any derogatory information in the report.

26. Section 10 of the Displaced Persons Act required a DPC report on each applicant, and such reports were regularly completed as records of the DPC.

27. Under Section 2(b) of the Displaced Persons Act, a person must have been "of concern" to the International Refugee organization (IRO) to have been eligible for admission to the United States. A person who was not "of concern" to the IRO was not eligible for admission to the United States under the DPA.

28. Under Annex I, Part II of the IRO Constitution an applicant who was found by the IRO to have assisted the enemy in persecuting civilian populations as not "of concern" to the IRO. Thus, such a person was not eligible for admission to the United States under the DPA.

29. Under Section 13 of the Displaced Persons Act, a member of, or a participant in, a movement hostile to the United States or to the form of Government of the United States, was ineligible for admission to the United States.

30. Under Section 10 of the Displaced Persons Act, an applicant who willfully misrepresented material facts for the purpose of gaining admission to the United States was ineligible for admission to the United States.

31. An applicant's service as an SS auxiliary and armed guard of civilians imprisoned at Trawniki Labor Camp would have been considered a material fact under the DPA.

32. An applicant's service as an SS auxiliary and armed guard of civilians and/or participation in the liquidation of the Jewish prisoners at Treblinka Labor Camp would have been considered a material fact under the DPA.

33. An applicant's service as a member of the SS Streibel Battalion forcing Polish civilians into labor service and/or acting as an armed guard of those forced laborers would have been considered a material fact under the DPA.

34. The duties of a United States Vice Consul serving in Stuttgart, Germany in 1950 included the issuance or rejection of immigration visas to applicants including displaced persons who sought to enter the United States under the Displaced Persons Act of 1948.

35. If the DPC determined that an applicant was not eligible for a visa under the Displaced Persons Act, the applicant would be rejected and the application would never reach a Vice Consul. If the DPC determined that the applicant was eligible, the applicant's file would be sent to the visa issuing office. The determination of the DPC that an applicant was eligible was not binding, and Vice Consuls made independent determinations as to whether an applicant was eligible for a visa.

36. Vice Consuls followed standard operating procedures for reviewing visa applications. These procedures were used throughout Germany and were established in 1949 when the Displaced Persons Program was initiated.

37. Vice Consuls studied each application in preparation for the personal interview with an individual applicant or family group. A personal interview was required of all applicants. Vice Consuls had the paperwork from all of the agencies with whom the applicant had dealt in applying for a visa and all other other required supporting documentation including the IRO application, the DPC report, the medical examination(s), security

reports, proof of future place of residence in the United States, and the visa application.

38. Vice Consuls personally interviewed visa applicants. If the applicant was not able to communicate in English, the interview was conducted with the assistance of an interpreter qualified in both English and in the native language of the applicant. Vice Consuls reviewed the visa application orally with the applicant.

39. Vice Consuls were particularly interested in the applicant's claimed places of birth and residence as well as their wartime activities. Vice Consuls routinely asked applicants about their wartime activities and whether they worked with or for the Germans during the war.

40. Before issuing visas, Vice Consuls had the applicant swear to the truth of the statements made in the written visa application and orally during the interview.

41. Applicants who misrepresented material facts about their wartime activities and whereabouts were ineligible for visas under § 10 of the DPA.

42. In early 1950, Defendant sought a determination from the United States Displaced Persons Commission ("DPC") that he was a Displaced Person as defined in the Displaced Persons Act of 1948, Pub.L. No. 80–774, ch. 647, 62 Stat. 1009 ("DPA") and therefore was eligible to immigrate to the United States.

43. On or about February 7, 1950, a DPC Report regarding Defendant was issued.

44. From Defendant's interview with United States officials, the DPC Report indicated that from 1937 to January 1944 Defendant resided with his parents in Jordanów, Poland, where he was employed as a shoemaker, and that "in January 1944 he entered Germany at Dresden and was kept there to May 1945."

45. In or about April 1950, an agent of the U.S. Army Counterintelligence Corps ("CIC") interviewed Defendant.

46. As noted by the CIC investigator in his report, Defendant stated that from 1937 until November 1943, he was an "apprentice shoemaker" in Jordanów, Poland; that from November 1943 until January 1944, he was in "Straflager [Penal Camp] Poztkum, Poland"; that he was "brought" to Dresden, Germany in January 1944; and that from January 1944 until April 1945 he was in the "Straflager [Penal Camp] Dresden." The report also states that "SUBJECT claims no political affiliation."

47. The CIC documents pertaining to the CIC investigation of Bronislaw Hajda are the type of documents regularly prepared and kept by the CIC as part of the investigation of applicants.

48. Relying on these statements, the DPC found Defendant eligible for visa consideration as a Displaced Person.

49. On May 24, 1950, Defendant applied for an immigration visa to enter the United States by submitting an Application for Immigration Visa and Alien Registration (Form 256a), No. I–1197028, (hereinafter "visa application") to the American consulate in Stuttgart, Germany.

50. On May 24, 1950, Defendant was interviewed by a Vice Consul and Defendant swore to the truth of the information on his visa application.

51. From Defendant's interview with United States officials, an immigrant visa was issued to Defendant as a Polish national under the DPA on May 24, 1950.

52. To gain admission to the United States, on or about June 24, 1950, Defendant executed an Affidavit as to Subversive Organizations or Movements (Form I–144), in which he stated that he was not and had never been "a member of or participant in any movement which is or has been hostile to the United States or the form of government of the United States" and that he had "never advocated or assisted in the persecution of any person because of race, religion, or national origin."

53. Defendant entered the United States at New York, New York on or about June 24, 1950.

54. In or about September 1955, Defendant applied with the U.S. Immigration and

Naturalization Service for naturalized United States citizenship.

55. On November 29, 1955, the United States District Court for the Eastern District of Michigan granted Defendant's Petition for Naturalization and issued him Certificate of Naturalization No. 7537428.

56. Exhibits 182, 187, 188 and 227–233 are properly certified official Polish public records containing the signature of Kazimiera Mrozinska *nee* Hajda, Defendant's sister.