UNITED STATES of America, Plaintiff–Appellee,

v.

Bronislaw HAJDA, Defendant–Appellant.

No. 97–2362.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1997.

Decided Jan. 23, 1998.

Rehearing Denied March 25, 1998.

Edward A. Stutman, Department of Justice, Office of Special Investigations, Washington, DC, Thomas P. Walsh, Linda Wawzenski, Asst. U.S. Atty., Office of the United States Attorney, Civil Division, Chicago, IL, Lisa M. Newell (argued), United States Department of Justice, Office of Special Investigations, Criminal Division, Washington, DC, for Plaintiff–Appellee.

George B. Collins (argued), Gregory A. Bedell, Collins & Bargione, Chicago, IL, for Defendant–Appellant.

Before EASTERBROOK, MANION, and EVANS, Circuit Judges.

1. They would be wrong. Estimates are that, of the 400,000 or so refugees who entered the United States after WWII, 100,000 were former Nazis or Nazi collaborators. John Francis Stephens,

**TERENCE T. EVANS, Circuit Judge.**

A former guard at a notorious Nazi concentration camp living as a neighbor? Four years ago, most people in Schiller Park, a Chicago suburb, might have thought things like this happen only in places like Argentina, not in America.[1] That sort of thinking probably changed in 1994, however, when the government brought this suit (under 8 U.S.C. § 1451(a)) to denaturalize Schiller Park resident Bronislaw Hajda, a 73–year–old retired factory worker who spent 22 years working at the Container Corporation of America in Chicago.

The government argued two grounds for denaturalization—that Hajda was ineligible for the 1950 visa he received because he served as a Nazi guard, and that he misrepresented material facts by failing to disclose his Nazi past on his visa application. Hajda concedes that if the charges against him are true he can be denaturalized, but he says the government nabbed the wrong man. He was a victim of the Nazis, he says, not a collaborator. The case went to trial and the district court found Hajda's story—that he wasn't a Nazi guard because he was a prisoner in another concentration camp-incredible. The district judge believed the government had the right man so he revoked Hajda's citizenship, *United States v. Hajda*, 963 F.Supp. 1452, 1458 (N.D.Ill.1997), a judgment Hajda now appeals. Hajda's deportation has been put on hold pending our review of his case.

Hajda's appeal, apart from a few pesky evidentiary issues, is an appeal on the facts. We'll start with those facts which are undisputed. Hajda, of Goralian (an ethnic group from southern Poland) extraction, was born on March 19, 1924, in Jordanov, a small town in lower southern Poland. He was the only "Bronislaw Hajda" living in Jordanov. Hajda had a brother, Wladyslaw, and two sisters, Kazimiera and Maria. From the late 1930's until 1942 he worked for his father as an apprentice shoemaker. His middle name was his father's name, Stanislaw.

*The Denaturalization and Extradition of Ivan the Terrible,* 26 Rutgers L.J. 821, 825 n. 28 (1995) (citing Allan A. Ryan, *Quiet Neighbors: Prosecuting Nazi War Criminals in America* 26 (1984)).

Jumping to 1945, after the war ended, Hajda got a job as a civilian guard for a Polish military unit working with the U.S. Army. After Congress passed the Displaced Persons Act (DPA) (which made it easier for European refugees to get visas but made Nazis and Nazi collaborators ineligible for visas), he decided to come to America. Following the DPA's rules, he first got certified as a displaced person and then filled out a visa application, which disavowed any Nazi affiliation. The DPA administrators, who were supposed to investigate visa applicants to screen out the unqualified, investigated (how deeply we don't know) Hajda but didn't turn up any Nazi connections.

In May of 1950 Hajda's visa application was granted. A month later he arrived in New York, and in 1955 he became a naturalized U.S. citizen. He settled in Schiller Park, worked at Container Corporation, and apparently lived an uneventful life until the government pinned this suit on him in 1994.

What did Hajda do from 1942 to 1945? To answer this question we first look to some historical events. By July 1942 Operation Reinhard, the German code name for the systematic slaughter of Polish Jews, was in full swing, and three death camps-Belzec, Sobibor, and Treblinka—were operating in south-central Poland. Numerous forced labor camps were also in full operation. Running these camps required manpower, and the Nazis didn't have enough Germans to police them. To make up for the lack of manpower, the infamous Nazi SS recruited Soviet P.O.W.'s. There were perks to being a guard—the recruits were paid cash—and the recruiting was successful.

However, as the tide of the war turned, a shortage of Soviet P.O.W.'s forced the SS to recruit Eastern European civilians into guard service. Starting in late 1942, the SS began recruiting guards from the Jordanov area.

The Nazis trained the recruits at a place called Trawniki. When recruits arrived they received an identification number, and the SS took down their personal information, snapped a photo, and obtained a signature and a thumbprint, all of which was put in a personnel file called a personalbogen. The SS instructed the recruits in the use of weapons and allowed them the practical experience of guarding Jewish prisoners at a nearby labor camp. The recruits were also taught enough German to understand their SS supervisors. Along the way, they were indoctrinated in the Nazi political philosophy. When training was complete the recruits received the rank of Wachmann (guard private) and were sent out to other camps.

Treblinka was one of the camps where Trawniki recruits ended up. It was actually two camps: the Treblinka Labor Camp (Treblinka I) and the Treblinka Death Camp (Treblinka II), an extermination facility where eventually hundreds of thousands of Jews lost their lives.

Supervised by the SS, Trawniki-trained guards at Treblinka I forced prisoners to work long hours on meager rations—bread, water, and watered down soup. In addition, the guards beat and often killed prisoners during labor details, and because all prisoners were eventually going to die, either from overwork or in the gas chambers, brutality was not forbidden. If any of the prisoners became too weak to work they were killed on the spot or taken into the woods and executed. From time to time the guards participated in the mass killings of prisoners.

The Nazis ordered Treblinka I evacuated on July 22, 1944, because the Red Army was closing in. Following orders, the guards first killed all Polish political prisoners; they released the other Polish prisoners. The next day they forced all the Jewish prisoners to lay face down in the middle of the camp. The guards then took the Jewish prisoners (in groups of 20 or so) to mass graves in the woods, where they were executed. Only a handful of the Jews at Treblinka I survived. By July 24 Treblinka I and II were evacuated and the guards fled west, away from the advancing Soviets.

Another camp, and one that figures prominently in this case, is Pustkow, a forced labor camp for, starting in the fall of 1942, Polish prisoners. Historians classify the camp at Pustkow into two periods—one from September 1942 until March 1943 and another from April 1943 until July 1944. During both

periods, guards treated the Polish prisoners cruelly, with severe punishment the usual order of the day. During the first period more than 60 percent of the Polish prisoners died from the brutal conditions and from a typhus epidemic in the winter of 1942–43. In early 1943 the shipment of prisoners into the camp stopped (until it was better equipped), and the Nazis couldn't fulfill their forced labor needs because of the high mortality rate. By April of 1943 camp conditions improved—the prisoners' barracks were waterproofed, latrines and showers were built, and blankets were handed out—but the oppressive conditions (including two mass killings of more than 20 Poles) remained constant. Around 30 percent of Pustkow's Polish prisoners died during the second period.

On July 27, 1944, the Nazis evacuated Pustkow. The Jewish prisoners were sent to Auschwitz while the Polish prisoners waited in boxcars for the Nazis to decide what to do with them. The Nazis eventually sent the women to the Ravensbruk camp and the men to the Sachsenhausen camp.

Trawniki was evacuated around the same time as Treblinka and Pustkow, and its remaining guards became the "Battalion Streibel," named after the camp's commandant. Other Trawniki-trained guards, including guards fleeing Treblinka, became part of the unit.

The Battalion's job was to force Polish civilians to build fortifications against the Red Army's advance, and it operated under the supervision of the SS Special Staff Sporrenberg (in German, "SS Sonderstab Sporrenberg"), which was headquartered at Jedrzejow, Poland. The Battalion's own headquarters were at Zlota until November of 1944, when they moved to Pinczow.

In January of 1945, when the Soviets launched a new offensive and tore through the Nazi lines (and the fortifications the Battalion built), the Battalion retreated into Germany, and many of its members went to Medingen, near Dresden. After the Allied firebombing of Dresden on February 13–14 and the resulting firestorm, Battalion members helped with rescue efforts. On April 25 a new Soviet offensive overran the Battal-ion's Medingen position, and the remaining guards scattered.

We turn now to Hajda's wartime activities. First, the government's version of the story. According to the government, the SS recruited Hajda during the fall of 1942, and he arrived at Trawniki (along with another man from Jordanov) on January 9, 1943. The Nazis gave him an identification number and took down the following information for inclusion in his personalbogen:

Name: Bronislaw Stanislaw Hajda
Birth date: March 19, 1924
Birthplace: Jordanov, Poland
Nationality: Goralian
Citizenship: Polish
Occupation: bootmaker or cobbler
Height: 165 cm (roughly 5'5")
Facial shape: oval
Hair: blond
Eyes: blue.

Hajda's personalbogen wasn't available at the trial of this case. The Soviets had it after the war, and in 1950 they gave it to Ukrainian authorities, who took measures (how extensive we don't know) to find Hajda and other Trawniki personnel until 1959. In 1992 the Ukrainians destroyed it because the time period they set for keeping it in storage expired. However, all wasn't lost because, before they gave it away, the Soviets summarized all the information (they didn't keep the photo, signature, or thumbprint) in an Archival Certificate. The Soviet Archival Certificate was given to the government, who introduced it into evidence at Hajda's trial. The certificate included all the personal identifying items we just quoted.

Hajda finished training sometime in March and became a Wachmann. A transfer order shows that on March 22, 1943, Hajda and 54 other guards were transferred to Treblinka I. They arrived 2 days later.

According to guard rosters, Hajda stayed at Treblinka I until its evacuation. The government also offered signed statements of other Treblinka I guards (from interrogation by the Soviets) that Hajda beat and shot prisoners and took part in the massacre on the last day the camp was open.

Sometime after the evacuation Hajda joined the Streibel Battalion. He was soon promoted to a higher position of Oberwachmann, or guard private first class. Hajda is listed on the Battalion's roster as late as April 6, 1945. According to the government, after the Battalion fell Hajda stayed near Dresden and mingled in and got lost in the sea of refugees.

The government had other evidence from an unlikely source, the Hajda family's collaboration trial. When the Nazis occupied Jordanov, Emil Wilczek, a local cop cozy with the Gestapo and SS, lived with the Hajdas. In 1944 Polish partisans killed Wilczek, and in 1945, after the Nazis retreated, Hajda's father (Stanislaw), mother (Zofia), and sister (Kazimiera) were charged with collaboration with the enemy and put on trial.

On February 26, 1945, Kazimiera signed two statements (both contained in a single document). In the first, a handwritten document, she denied her own collaboration with the Germans but said, "My brother served in the German military, in the SS." In the second one, a typed statement, she said, "My brother Bronislaw Hajda, was a Pole like myself, but he was employed in the so-called 'Wachmannschaft' [guard forces] of the 'Sonderstab' [special staff] in Jedrzejow."

During the collaboration trial, on February 27, 1946, Stanislaw said, "My son Bronislaw went to Germany to join in the SS." This statement was part of the trial record, but Stanislaw, who has since died, never signed it. Stanislaw, Zofia, and Kazimiera were acquitted of collaboration at the end of the trial.

Hajda has a different account of his wartime activities. He says the Gestapo arrested him on a train in 1942. They sent him to Pawiak prison in Warsaw, he says, and later to Montelupich prison in Krakow. Finally, he claims, he ended up at Pustkow in 1943.

Hajda, who we noted earlier is now 73 years old, stands 173 cm (5'-8") tall today and has dark hair. He testified at trial about his memories of Pustkow. Contrary to the historical account, Hajda said that although he was forced to work he was never punished and didn't see anyone else punished. In addition, he said he saw only two dead bodies the whole time he was at Pustkow. Hajda also testified that he saw a man named Stanislaw Sweichowicz at Pustkow, and he offered Swiechowicz's testimony, by way of deposition, to corroborate his story. However, Sweichowicz's testimony differed from Hajda's regarding what Sweichowicz was wearing (a prisoner's striped uniform or a civilian's white clothing), whether they knew each other before Pustkow, and how often they talked. It also leaked out that Sweichowicz decided to give his deposition after sharing a bottle of Vodka with his next door neighbor, Hajda's brother Wladyslaw.

Hajda said he stayed at Pustkow until the SS took him out sometime in 1944, when the weather was cold and other prisoners were still there. He claims they took him to Dresden, where he arrived around the time of the firebombing. In his deposition he said that the trip took about 4 days. However, at trial, he testified that the trip took several months because every 20 miles the Nazis made him get out and dig bunkers. He said he eventually escaped.

Hajda filed pretrial motions in limine to exclude the damaging statements of Stanislaw, Kazimiera, and the Treblinka guards. The district court denied the motions.

After a 4-day court trial the district judge (David H. Coar) decided that Hajda was the same Bronislaw Stanislaw Hajda who served as a Treblinka guard, based largely on the government's "overwhelming" documentary evidence. *Hajda*, 963 F.Supp. at 1458. Judge Coar found Hajda's testimony, and that of Sweichowicz, incredible. *Id.* at 1458–60. The judge also discounted the discrepancies in height and hair color between Hajda at trial and the information in the Archival Certificate. *Id.* at 1458.

■ In considering this appeal we first address Hajda's objections to the district court's evidentiary rulings employing an abuse of discretion standard. *Taylor v. National R.R. Passenger Corp.*, 920 F.2d 1372, 1375 (7th Cir.1990). The main evidentiary issue is whether the district court properly denied Hajda's motion in limine and admitted Stanislaw and Kazimiera's statements along

with the statements from the Treblinka guards. These documents are more than 20 years old and they were properly authenticated, so they are exceptions to the hearsay rule admissible under Rule 803(16) of the Federal Rules of Evidence. However, this admissibility exception applies only to the document itself. If the document contains more than one level of hearsay, an appropriate exception must be found for each level. Fed.R.Evid. 805.

■ As for Kazimiera's statements, while a government official prepared them, Kazimiera signed and adopted them, so they contain only one level of hearsay, which makes them admissible under Rule 803(16). *See United States v. Lewis,* 954 F.2d 1386, 1394–95 (7th Cir.1992). The signed statements of the Treblinka guards are admissible for the same reason.

■ Stanislaw's statement, on the other hand, isn't signed, so it contains two levels of hearsay. The document itself falls under Fed.R.Evid. 803(16), but Stanislaw's actual statement needs a separate exception in order to be admissible. Here, the proper exception is a declaration against interest, which permits hearsay statements when (1) they are against the declarant's penal or pecuniary interest at the time made; (2) corroborating circumstances show the trustworthiness of the statement; and (3) the declarant is unavailable. Fed.R.Evid. 804(b)(3); *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990).

Stanislaw's statement meets all the requirements. Given the danger of guilt by association, it seems to us that a declarant's statement that his son collaborated with the Nazis is contrary to a father's interest when made at a Nazi collaboration trial. Second, Stanislaw's statement is clearly corroborated by the other documentary evidence. Finally, Stanislaw, being dead, was unavailable.

Finally, we note that although these statements were admissible under the rules, the real argument here goes to their weight, not their admissibility. And on that point, it was not even close to an abuse of discretion for Judge Coar to credit these statements which seem to us to be almost unassailable.

■ The other evidentiary issue arose when the government tried to attack the credibility of Hajda's limited memory of Pustkow by eliciting testimony from two Treblinka survivors and showing how vivid their memories were. The district court allowed the testimony but didn't rely on it in deciding the case. We acknowledge that the probative value of this testimony isn't great, but because this was a bench trial and the judge didn't rely on it, we fail to see how Hajda can claim prejudicial error on the point.

■ Having disposed of Hajda's evidentiary objections, we move to the merits of his appeal, the claim that the judge clearly erred when he found that Hajda was the Bronislaw Hajda who served the Nazis. We review the district court's findings of fact for clear error, keeping in mind that, in a denaturalization case, the government must prove its claims by clear, convincing, and unequivocal evidence. *United States v. Kairys,* 782 F.2d 1374, 1379 (7th Cir.1986).

Hajda's first claim is that the judge discounted the discrepancies in height and hair color. We find no error, clear or otherwise. While the disparity in height is 3 inches or 8 cm (between 5'5 and 5'8), there are many explanations for the difference—Hajda, 19 years old in 1943, could have grown, or the height may have been erroneously reported or transcribed—and, in any event, the perfect matches in the other categories more than made up for this rather minor difference. The discrepancy in hair color is in the same boat—a minor variance.

The government here introduced more than enough evidence to meet its burden of proof. As the only Bronislaw Hajda from Jordanov, his name, when combined with his birth date and birthplace on the guard rosters, is strong evidence. In addition, the Archival Certificate exactly matched Hajda in unique categories like occupation, nationality, and eye color. Finally, there were Kazimiera's and Stanislaw's statements.

Hajda also says the district judge ignored testimony that he was at Pustkow. As a whole, however, Hajda's testimony of Pustkow had gaping holes that destroy its credi-

bility. Even if he arrived during Pustkow's second period, we can't believe that he lived in such a brutal place for more than a year and saw nobody punished and only two dead prisoners.

Also incredible is Hajda's tale about how he arrived in Dresden around the time of the firebombing. He testified that when he left Pustkow other prisoners were still there. That would make it, at the latest, July 1944. However, he also says it was cold when he left, pushing the date back into spring. This left Hajda with a period of at least 7 months to account for. This problem was compounded by his admission that the trip from Pustkow to Dresden took only about 4 days. With his back to the wall, he came up with the story that his trip to Dresden took up to 4 months, which still doesn't account for all the time. In addition, the historical evidence is that the Polish prisoners were sent to Ravensbruck and Sachsenhausen (or Auschwitz) when Pustkow closed, and there is no evidence that any prisoners were sent to Dresden.

Viewing this incredible testimony, we have to conclude that the district court correctly discounted Hajda's testimony.

As for Sweichowicz, he clearly told a different story than Hajda, and the difference was great enough to call both stories into question. Combined with Sweichowicz's bias as the neighbor, friend, and drinking buddy of Hajda's brother Wladyslaw, it's clear that the district court didn't commit error by finding Sweichowicz's testimony incredible.

Kazimiera's trial testimony is similarly incredible. Her denial that her statements bore her signature was contradicted by a handwriting expert. Her other testimony— that she never made the statements and thought Hajda was at Pustkow—reeks of interest and is entitled to little weight, as the district judge determined.

Hajda's final argument is that Kazimiera's typed statement was altered. Again, we find no error. While the portion of the typed statement that refers to Hajda is different from the rest—it is single spaced while the rest is double spaced—we have little reason to suspect alteration because Kazimiera's other statement says the same thing.

Finding no error, we AFFIRM the district court's judgment.