*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

IWAN MANDYCZ,

        *Defendant-Appellant.*

No. 05-1424

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 00-40148—Paul V. Gadola, District Judge.

Argued: March 7, 2006

Decided and Filed: May 22, 2006

Before: SUTTON and GRIFFIN, Circuit Judges; OBERDORFER, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Joseph A. Siciliano, HALIW, SICILIANO, MYCHALOWYCH, VAN DUSEN & FEUL, Farmington Hills, Michigan, for Appellant. Adam S. Fels, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Andrew J. Haliw III, Elias T. Xenos, HALIW, SICILIANO, MYCHALOWYCH, VAN DUSEN & FEUL, Farmington Hills, Michigan, for Appellant. Adam S. Fels, Jeffrey L. Menkin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

---

    SUTTON, Circuit Judge. Iwan Mandycz challenges the district court's determination that he "illegally procured" his naturalization as an American citizen by failing to acknowledge his service as a prison guard in two concentration camps during World War II. *See* 8 U.S.C. § 1451(a). In bringing this challenge, he argues that the denaturalization order is not supported by the evidence, that the trial violated his due process rights, that laches barred the government from bringing this action and that the court erred in admitting certain evidence under the ancient-documents exception to the hearsay rule. We affirm.

---

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

I.

On January 23,1920, Iwan Mandycz was born in Olievo-Korolivka, a small village located in what was then Poland, for a time was Nazi Germany, for a longer time was the Soviet Union and is now Ukraine.  In the summer of 1941, as part of Operation Barbarossa, Nazi Germany took control of Poland and, with it, Olievo-Korolivka.

As the war began to turn against Germany in 1942 and 1943, the country committed increasing numbers of troops to the eastern and western fronts, forcing it to recruit Eastern Europeans to fill positions vacated by the mobilized Germans.  From February to April 1943, various SS units ("Schutzstaffel" or "protection squads," JA 2073) recruited men from the Olievo-Korolivka area to work as guards (*Wachmann*) at German concentration and forced-labor camps.  Mandycz was one such recruit.

On April 7, 1943, Mandycz arrived by train at an SS training camp in Trawniki, Poland, where the Germans assigned him a unique identification number—3308.  All guards at Trawniki signed a declaration that they were "subject to the disciplinary code of 'Police Troops' and not to the jurisdiction of local or German civil courts."  JA 911 (expert testimony).  All guards "received rifles and live ammunition."  JA 912.  All guards "received service pay," *id.*, "free food, medical care, shelter and clothing," JA 913.  And all guards were eligible for "both an informal type of leave that might last an afternoon or for a single day, or more formally issued leave that would run anywhere from one week to three weeks."  JA 2021.  The Germans did not treat the guards as part of the German army but as "part of the German police ap[p]aratus."  JA 2023.

Adjacent to the training camp was a forced-labor camp "in which the SS and police authorities incarcerated up to 6,000 Jewish prisoners and compelled them to work in war-related industries."  JA 886.  As part of their training, the Trawniki enrollees guarded the camp.

A German transfer roster, dated May 25, 1943, indicates that the Germans transferred *Wachmann* No. 3308, identified as "Iwan Manditsch," to another Polish labor camp, Poniatowa.  JA 985–86.  On November 4, 1943, while Mandycz worked as a guard at Poniatowa, the Nazis massacred approximately 14,000 prisoners held at the labor camp.  During the massacre, Trawniki-trained guards cordoned off the camp while German SS troops forced Jewish men, women and children to stand in long, wide trenches, where the SS troops shot them with machine guns.  The shooting lasted "all day long until the early evening," JA 2105, after which the SS troops burned the victims' bodies.

A second transfer roster indicates that on November 17, 1943, the Germans transferred *Wachmann* No. 3308, identified as "Iwan Manntitsch," from Poniatowa to Trawniki.  JA 994–97.  A third transfer roster created three days later indicates that the Germans reassigned *Wachmann* No. 3308, identified as "Iwan Mandytsch," from Trawniki to the "SS Death's Head Guard Battalion, Sachsenhausen."   JA 1015–16.   It is not clear "whether Guard 3308 actually reached Sachsenhausen," D. Ct. Op. at 14, and his whereabouts from this point until the end of the war remain unclear.

In 1946, the United Nations established the International Refugee Organization to care for "the approximately 1,200,000 remaining World War II refugees in Europe."  JA 233; *see Fedorenko v. United States*, 449 U.S. 490, 495 n.5 (1981).  Consistent with this goal, it assisted "refugees and displaced persons" in returning "to their countries of origin or resettling in different countries."  JA 233.  Two years later, in 1948, "Congress enacted the Displaced Persons Act . . . to enable European refugees driven from their homelands by the war to emigrate to the United States without regard to traditional immigration quotas."  *Fedorenko*, 449 U.S. at 495.

In 1948, Mandycz sought to emigrate from Salzburg, Austria to the United States.  To receive an immigrant visa under the Displaced Persons Act, he had to show that he was "the concern" of the International Refugee Organization.  Displaced Persons Act of 1948, Pub. L. No. 80-774, § 2(b), 62 Stat. 1009 (defining a displaced person as "any displaced person or refugee . . . who is the concern of the International Refugee Organization").  The Constitution of the International Refugee Organization excluded from this category any person who could "be shown [ ] to have assisted the enemy in persecuting civil populations."  *Fedorenko*, 449 U.S. at 495 n.4.  Relying on a questionnaire completed by Mandycz, the International Refugee Organization certified to the Displaced Persons Commission that Mandycz had not engaged in persecution.

The Commission in turn referred the case to the Army Counterintelligence Corps, which interviewed Mandycz to determine whether he was "admissible into the United States under authority of the [Displaced Persons] Act of 1948."  JA 331.  Mandycz informed the Corps that from 1943 to 1944 he had worked as a forced laborer for the "Seuring Company" in Vienna.  JA 547, 970.  He also produced a birth certificate dated July 23, 1920.  The investigators did not have access to the records that would have implicated Mandycz as a prison guard because "the three rosters identifying Iwan Mandycz as guard 3308 . . . [were] held behind the Iron Curtain."  JA 2389.  The Corps also did not receive "cooperation from local authorities or security agencies in countries under Soviet occupation [such as Poland and Ukraine], so it was difficult . . . to verify the background of applicants from these countries."  JA 486–87 (report of Mario DeCapua, head of investigations for the Commission after World War II).  "In such cases, the [Corps and Commission] were forced to rely more heavily on full disclosure and honesty by the applicants."  *Id.* at 487.  Relying on Mandycz's representations, the Corps reported to the Commission that the "investigation disclosed no evidence that [the] Subject is or has been a member of, or a participant in, any movement which is or has been hostile to the United States."  JA 533.

On December 2, 1949, while still in Austria, Mandycz received his visa.  He sailed from Bremerhaven, Germany, later that month, and on December 27, he entered the United States.  On May 13, 1955, he applied for naturalization as a United States citizen with the Immigration and Naturalization Service; on June 30, the United States District Court for the Eastern District of Michigan granted his petition for naturalization.  Mandycz settled in Detroit, where he has lived to this day.  Beginning in 1950 or so, he began working at Chrysler, first as a janitor and then as an auto worker, and remained employed there until his retirement from the company in 1983.

After the dissolution of the Soviet Union, the United States gained access to archives that implicated a number of post-war immigrants in assisting Nazi Germany.  In March 1993, the Office of Special Investigations (OSI), a division of the Department of Justice that "detects and investigates individuals who took part in Nazi-sponsored acts of persecution abroad before and during World War II," OSI website, *available at* http://www.usdoj.gov/criminal/osi.html (last visited May 12, 2006), received materials from post-war Soviet interrogations indicating that an Iwan Mandycz had served as a guard at the Trawniki and Poniatowa camps.  On September 17, 1996, after additional information implicated Mandycz in acts of persecution, OSI requested "a voluntary interview" with him to discuss the materials it had gathered.  JA 82.  Mandycz "declined to be interviewed."  *Id.*  In March 1997, OSI attempted to confirm Mandycz's birth date with Ukrainian authorities.  After a couple of years (and some prodding by OSI), the Procurator General of Ukraine certified in August 1999 that Mandycz was born on January 23, 1920, exactly six months earlier than the birth date he had given during the immigration process.

On April 19, 2000, OSI filed a complaint in the Eastern District of Michigan under 8 U.S.C. § 1451(a) to revoke Mandycz's citizenship, alleging that he had illegally procured it.  At some point between 1996 and the filing of the complaint, Mandycz began to suffer from Alzheimer's disease.  On January 12, 2001, following an examination by OSI's doctors, the court appointed a guardian under Rule 17(c) of the Federal Rules of Civil Procedure to represent Mandycz throughout the

proceedings. After several pretrial proceedings (including a June 2002 appeal that this court dismissed as an impermissible interlocutory appeal, *see United States v. Mandycz*, 351 F.3d 222 (6th Cir. 2003)), the district court held a bench trial from June 14 to June 17, 2004. On February 28, 2005, the court determined that Mandycz had participated in acts of persecution and revoked his citizenship.

## II.

"The Constitution authorizes Congress to 'establish a uniform Rule of Naturalization' (Art. I, § 8, cl. 4)," and naturalization remains "a privilege to be given or withheld on such conditions as Congress sees fit." *Schneiderman v. United States*, 320 U.S. 118, 131 (1943). In exercising this authority, the National Legislature has provided for the "revocation" of "illegally procured" certificates of naturalization. 8 U.S.C. § 1451. "[A] naturalized citizen's failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)." *Fedorenko*, 449 U.S. at 514. The "statutory prerequisite[] for naturalization" in place at the time of Mandycz's naturalization—"the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1427(a) and 1429"—"required that the individual possess a valid unexpired immigrant visa." *Id*. at 514–15. Whether Mandycz possessed a valid visa turns on the requirements of the Displaced Persons Act. Because it is by now well established that "service as a guard at a Nazi training camp, and subsequent concentration camps, would make him ineligible for a visa under the [Displaced Persons Act]," *United States v. Demjanjuk*, 367 F.3d 623, 630 (6th Cir. 2004), the question comes down to this: Did Iwan Mandycz serve as a guard at Trawniki and Poniatowa or, put another way, was he Guard 3308? If he was, he agrees that he would not have been eligible for a visa in 1949. And if he was, he agrees that he illegally procured his 1955 naturalization and that it must be revoked today.

In challenging the district court's conclusion that Mandycz and Guard 3308 are one and the same, Mandycz makes one substantive argument and three procedural arguments: (1) the district court erred in finding he was Guard 3308; (2) the Due Process Clause prohibited the government from undertaking this denaturalization proceeding once it learned he was suffering from Alzheimer's disease; (3) laches barred the government from bringing this denaturalization proceeding; and (4) the district court erred in admitting certain evidence. In resolving these disputes, we review the district court's findings of fact for clear error, *id*. at 628, its conclusions of law for error, *id*. at 636, and its evidentiary rulings for abuse of discretion, *id*. at 633.

## A.

Mandycz begins by contending that "OSI's evidence did not meet the unusually high burden of proof required in denaturalization proceedings." Mandycz Br. at 14 (capitalization removed). The government, it is true, faces a rigorous burden of proof in this setting. *Schneiderman*, 320 U.S. at 125 ("To set aside such a grant [of citizenship] the evidence must be clear, unequivocal, and convincing—it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt.") (internal quotation marks omitted). But in our view, clear, unequivocal and convincing evidence supports the district court's finding that Mandycz was Guard 3308 and that he "'assisted the enemy in persecuting civil populations.'" *Fedorenko*, 449 U.S. at 496 n.4 (quoting the Int'l Refugee Org. Const., Annex I, Part II, 62 Stat. 3051–52).

The government's proof rested on a collection of German guard-transfer rosters, which identified Mandycz as Guard 3308, and evidence corroborating that identification. *First*, the three rosters identify Guard 3308 as having the same first name as Iwan Mandycz and as having a last name that phonetically matches Mandycz's last name. The rosters variously describe Guard 3308 as "Iwan Manditsch," JA 986, "Iwan Manntitsch," JA 997, and "Iwan Mandytsch," JA 1016. Each spelling of the last name, sure enough, does not match "Mandycz" letter for letter, but the

differences are fairly explained.   As the evidence showed, German clerks processing Eastern European guards repeatedly faced challenges in transliterating unfamiliar names.   The name Mandycz was no exception:  His last name ends with a sound that is rendered "sh" in English, "cz" in Polish, "ch" in Russian and "sch" in German.  JA 880 (expert testimony).  A similar problem plagued the clerks in trying to reduce the initial sound of the second syllable of Mandycz's name to letters—with variations from "dy" to "di" to "ti."  JA 881 (expert testimony); *see also id.* ("As a result of [ ] haphazard transliteration decisions and general difficulties with foreign names, the German clerks spelled names inconsistently throughout their records.").  Because Guard 3308 had the same first name as Mandycz and the same phonetic last name as Mandycz, the transfer records support the district court's decision. *See generally Grannis v. Ordean*, 234 U.S. 385, 395–96 (1914) ("But, even in names, 'due process of law' does not require ideal accuracy.  In the spelling and pronunciation of proper names there are no generally accepted standards; and the well-established doctrine of *idem sonans* ['the same sound'] . . . is a recognition of this."); *United States v. Emuegbunam*, 268 F.3d 377, 395 (6th Cir. 2001) ("Emuegbunem's argument that the misspelling of his name vitiates the indictment is likewise unavailing.  A name need not be correctly spelled in an indictment, if substantially the same sound is preserved.") (internal quotation marks omitted).

*Second*, in addition to matching Mandycz's first name exactly and his last name phonetically, the rosters identify his acknowledged place of birth and the only ascertainable date of birth for him. The third roster identifies "Iwan Mandytsch, 3308" as being "born on 23 January 1920 in Oliwa Koroliwka, Horodenka."  JA 1016.  This birthplace matches Mandycz's admitted birthplace and represents the birth date of the only Iwan Mandycz for whom the Ukrainian government has a record of birth in 1920.  The parents listed on his Ukrainian birth certificate ("Dmytro Mandych" and "Mariya Skits'ko," JA 1064) match the names admitted by Mandycz to be those of his parents ("Dmytro Mandycz" and "Maria Skidzka," JA 762).  And the evidence supported the district court's conclusion that no other Iwan Mandycz was born in Olievo-Korolivka in 1920.  Mandycz, it is true, proffered a birth certificate dated "23 July 1920" in connection with his application for an immigration visa.  JA 338.  But forensic analysis revealed that the date on this birth certificate, exactly six months after the date listed on the Ukrainian-issued certificate and the transfer roster, could not be trusted because the authenticating stamp on the document had been "hand retouched." JA 2441.  This evidence led the forensic expert and the district court to determine that the birth certificate should "not be considered an authentic document" when it comes to the July 23 birth date listed there.  JA 2452.

*Third*, the guard-identification numbers further eliminate the possibility that the transfer rosters identify someone other than the defendant.  In each instance, the roster lists Mandycz's name next to the same number—3308.  Expert testimony, credited by the district court, showed that these numbers were "specific to the individual guard and were never changed as long as he belonged to the Guard Forces of the SS."  JA 882.  "Trawniki officials never 're-used' or recycled the identification numbers of discharged men."  JA 910.  Nor were these numbers "reassigned after a man left the Guard Forces or was killed."  JA 882.  The repeated correlation of the same name (Mandycz) with the same number (3308), in combination with the biographical information listed on the third roster, provides compelling evidence that there was one and only one Iwan Mandycz who was born in Olievo-Korolivka and who served as Guard 3308.

*Fourth*, still other evidence corroborates the information contained in the transfer rosters. Statements made by other Trawniki guards during postwar Soviet interrogations identified Mandycz as a guard at Trawniki and Poniatowa and correctly remembered his birth date, birthplace, rank, nationality and itinerary.  Trawniki-trained guard Stepan Perig remembered "Ivan Dmitrievich Mandych" and remembered that his "year of birth was 1920," that his "place of birth is in O.-Korolivka," that "[h]e enrolled in the SS police training camp in Travniki in April 1943," that "[h]e underwent special training and guarded prisoners" and that "[h]e guarded prisoners in the camp of Ponyatovo."   JA 1082.   Ivan Sidorak also remembered "Ivan Dmitrievich Mandych" and

remembered that his "year of birth [was] approximately 1920," that "[h]is place of birth is in the village of Olievo Korolivka," that "[h]e is Ukrainian by nationality," that "[h]e was drafted with me to serve in the SS" and that "[h]e served as a *Wachmann* in the SS police training camp in Travniki from April 1943 until October 1943, after which he was sent to the death camp in Ponyatovo." JA 1124.

Perig's and Sidorak's recollection of the middle name "Dmitrievich" further ties Mandycz to Guard 3308. As a patronymic, a name derived from one's father, the middle name of "Dmitrievich" connects Mandycz to his father, whose name (Mandycz concedes) is Dmytro.

Still another individual, Vasilij Gajdich, recalled that "Mandich and I arrived at the 'SS' police training camp at Travniki at the same time," that "[h]e swore an oath and gave a commitment of voluntary service for the German punitive organs," that "[h]e underwent a specialized course of training, after which he served as an 'SS *Wachmann*' and guarded prisoners" and that "[u]pon completing training, he and I were sent to the 'SS' camp in Ponyatovo." JA 1243; *see* 473–74.

*Fifth*, Mandycz's postwar relationship with Petro Perih, another guard at Trawniki, corroborates the district court's identification finding. During the postwar interrogations, Perig and Sidorak stated that Petro Perih had served at Trawniki. *See* JA 1102–03 (Perig: "[Perih] arrived at the SS training camp in Travniki with me."); JA 1125 (Sidorak: "From April 1943, [Perih] served at the SS police training camp in Travniki. He performed the duties of an SS *Wachmann*."). They also gave similar estimates of Perih's date of birth (1922 or 1923) and remembered that he came from the same hometown (Olievo-Korolivka). Perih's Canadian immigration documents tie him to the Perih remembered by Perig and Sidorak, as they state that he was born in Olievo-Korolivka in 1924. After the war, Perih attended the wedding of Mandycz's daughter. Mandycz's telephone records also reveal that shortly before the government filed the complaint in this case, someone used his telephone to place three calls to Perih's home. Mandycz also listed Petro Perih during discovery in this case as a person who would have "knowledge or information concerning your whereabouts, employment or activities in Europe between or including 1939 and 1945." JA 792–93. As the district court permissibly found, Mandycz's "post-war contacts with Petro Perih corroborate [Mandycz's] identification with Guard 3308." D. Ct. Op. at 26.

While considerable direct and corroborating evidence links Mandycz to Guard 3308, little evidence supports his contrary account of activities between 1943 and his arrival in this country. In one version of events, recounted in his October 1949 visa application, Mandycz claimed to work for a "Seuring Company" located in Vienna, Austria. JA 547. Yet neither Mandycz nor anyone else has produced any evidence showing that such a company existed. "[R]esearch has not turned up any record that a firm by the name of 'Seuring' or 'Seyring' ever existed in Vienna," JA 974 (expert testimony), and Mandycz stated in his 2001 deposition that he had never worked in Vienna and did not think that he had worked at Seuring.

In another version of events, recounted by Mandycz and confirmed by his daughter based on what Mandycz has told her throughout her life, Mandycz did not work in Vienna, but resided "in a camp in the Linz [Austria] area and was assigned out frequently to different farmers to work as an agricultural laborer." JA 2126. Yet the account of Mandycz as a forced agricultural worker has no documentary support and conflicts with other evidence. *See* JA 976 (noting that no extant account "depicts living in a camp with others and being picked up as needed by local farmers"); JA 977 (noting that "[a]gricultural laborers typically lived on the farms where they worked" because "German labor authorities realized significant cost savings by shifting the costs . . . onto individual farmers"); JA 2126 ("[F]orced laborers who were forced to reside in camps together were generally deployed at industrial concerns or in rural processing factories."). Austria also created social-insurance records for forced laborers (in the event the laborer destroyed property of the employer), but the Austrian government's "search[] for records verifying that Mandycz served as a forced

laborer during World War II . . . . produced no evidence that Iwan Mandycz resided as a forced laborer or was employed as a forced laborer in Austria . . . between 1943 and 1945." JA 2124. In the face of considerable evidence that Mandycz was Guard 3308 and in the absence of competing evidence that he was not, we credit the district court's amply supported finding that that is who he was.

Trying to fend off this conclusion, Mandycz points out that the government did not produce evidence that it has produced in similar denaturalization proceedings—namely, a Trawniki personnel file that would have contained Mandycz's photograph and fingerprint as well as other biographical information. Doubtless, the district court (and we) would have preferred the record to contain this highly probative evidence. But just 1,200 out of 5,082 Trawniki guard files survived the war. So the absence of such a file does not prove that one never existed. The question rather is whether the evidence produced clearly and unequivocally showed that Mandycz was Guard 3308. The government's evidence satisfied that burden, and other courts have credited similar forms and amounts of evidence in reaching similar conclusions. *See, e.g.*, *United States v. Szehinskyj*, 277 F.3d 331, 337 (3d Cir. 2002); *United States v. Hajda*, 135 F.3d 439, 444 (7th Cir. 1998); *United States v. Tittjung*, 753 F. Supp. 251, 256 (E.D. Wis. 1990), *aff'd*, 948 F.2d 1292 (7th Cir. 1991).

Mandycz also questions whether the district court should have relied on the Soviet interrogations, noting that they contain inconsistencies in his physical description. Perig described Mandycz as "tall, full build, blond hair," JA 1103, while Gajdich described him as "tall in height, thin build, elongated face, brown-black hair," JA 1243. The district court held that "[i]n light of the documentary and corroborating evidence, the variance[s] in physical descriptions of Iwan Mandycz provided in the interrogations are factually insignificant and unpersuasive." D. Ct. Op. at 26.

Given the considerable documentary and corroborating evidence connecting Guard 3308's name, birth date, birthplace and parents to Mandycz, these modest discrepancies—occurring in two pieces of corroborative, otherwise consistent evidence and concerning shades of hair color and build—do not undermine the district court's identification finding. The statements were given in 1948, five years after these two individuals served with Mandycz over the course of a seven-month period from April 1943 to November 1943. "[P]hysical descriptions," as the record confirmed, "are often relative and often depend on the self-perception of the individual who is describing the person in question." JA 1996. And even if the two men accurately recollected and assessed these physical features, no evidence shows that the two men perceived Mandycz at the same time. Summer of course may give brown hair a blond appearance, and it would hardly be unusual for guard service during a war to convert a full build into a thin one in a matter of months. In the end, these alleged discrepancies do not undermine the district court's finding—as other courts have found in similar circumstances. *See, e.g.*, *Hajda*, 135 F.3d at 444 ("[T]here are many explanations for the difference [in height] . . . and, in any event, the perfect matches in the other categories more than made up for this rather minor difference. The discrepancy in hair color is in the same boat—a minor variance."); *see also, e.g.*, *Neal v. Acevedo*, 114 F.3d 803, 807 (8th Cir. 1997) ("The minor discrepancies in the victim's descriptions of Neal were brought before the jury by defense counsel. The jury could have rationally discounted these discrepancies in light of the victim's positive identification of Neal at trial, the other circumstantial evidence connecting Neal to the crime, and the problems with Neal's alibi defense.").

Mandycz, more generally, contends that the district court should not have credited the Soviet interrogation records, noting that in 1995 (in the district court's words) "three men told Canadian authorities that Soviet investigators coerced or falsified confessions from them in the 1940's." D. Ct. Op. at 27. But in choosing not to credit these recantations, the district court observed that the three statements "contradict reliable historical evidence indicating that each [individual] participated in Nazi service" and that the three individuals made the statements to "avoid[] implicating themselves in atrocities and other bad acts." *Id*. at 27. Under these circumstances, the

district court did not abuse its discretion in declining categorically to reject the use of any and all Soviet interrogation records. *See, e.g.*, *United States v. Kungys*, 793 F.2d 516, 520 n.2 (3d Cir. 1986) ("[W]e reject the suggestion that all depositions taken in the Soviet Union should be automatically excluded from evidence."), *rev'd on other grounds*, 485 U.S. 759 (1988).

Nor, more specifically, has Mandycz shown that the interrogation records used in this instance were of dubious value. The three cited individuals have no connection to Mandycz, and the transfer records corroborate the interrogation records that the district court considered. On this record, we cannot say that the district court committed reversible error in considering these records.

B.

Mandycz next argues that the government violated his due process rights by bringing this denaturalization proceeding against him while he was mentally incompetent. The incompetence of any party to a denaturalization suit, he argues, operates as an absolute bar to the action, and even if that is not the case, the circumstances of his incompetency should have required the district court to halt this proceeding. We disagree.

In September 2000, OSI's doctors examined Mandycz and determined that Alzheimer's had taken a sufficient toll on him such that he was no longer of sound mind. Had the district court found that Mandycz was incompetent based on these examinations, that finding would have precluded the government from proceeding against him in a criminal proceeding. As the Supreme Court has "repeatedly and consistently recognized," the criminal prosecution "of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (internal quotation marks omitted). A criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see also Cooper*, 517 U.S. at 368 ("The test for competence to stand trial . . . is whether the defendant has the present ability to understand the charges against him and communicate effectively with defense counsel.").

The problem is that "[a] denaturalization suit is not a criminal proceeding," *Schneiderman*, 320 U.S. at 160; it is a "civil case," *Addington v. Texas*, 441 U.S. 418, 424 (1979); *see United States v. Joudis*, 800 F.2d 159, 162 (7th Cir. 1986) ("Denaturalization and deportation are civil proceedings."). Criminal cases offer many due process protections—*e.g.*, jury trial, indictment, beyond-a-reasonable-doubt burden of proof, right to counsel—that civil proceedings, including denaturalization proceedings, do not. *See, e.g.*, *United States v. Schellong*, 717 F.2d 329, 336 (7th Cir. 1983); *United States v. Koreh*, 144 F.R.D. 218, 220 (D.N.J. 1992); *see also INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984); *Nelson v. INS*, 232 F.3d 258, 261 (1st Cir. 2000).

All of this remains true even when the case involves an incompetent party. *See Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 767 (7th Cir. 2004); *Nee Hao Wong v. INS*, 550 F.2d 521, 523 (9th Cir. 1977); *United States v. Weinstein*, 511 F.2d 622, 628 (2d Cir. 1975); *see also Mohamed v. TeBrake*, 371 F. Supp. 2d 1043, 1046 (D. Minn. 2005); *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 695 F. Supp. 1426, 1432 (E.D.N.Y. 1988).

So while the commencement of a civil case does not suspend the Due Process Clause, it does alter the fairness requirements of the Clause. Whereas due process protects incompetent criminal defendants by imposing an outright prohibition on trial, it protects incompetent civil parties by requiring the court to appoint guardians to protect their interests and by judicially ensuring that the guardians protect those interests. *See* Fed. R. Civ. P. 17(c) ("The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person."); *see also Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 203 (2d Cir. 2003) ("[T]he district judge

should be aware that due process considerations attend an incompetency finding and the subsequent appointment of a guardian ad litem."); *Salomon Smith Barney, Inc. v. Harvey*, 260 F.3d 1302, 1309 (11th Cir. 2001), *vacated on other grounds*, 537 U.S. 1085 (2002); *Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 652 (2d Cir. 1999); *Garrick v. Weaver*, 888 F.2d 687, 693 (10th Cir. 1989); *Genesco, Inc. v. Cone Mills Corp.*, 604 F.2d 281, 285 (4th Cir. 1979). Independent of the court's duty to appoint a guardian to look after his interests, Mandycz of course also is entitled to the other basic protections of due process in a civil setting. *See United States v. Kairys*, 782 F.2d 1374, 1384 (7th Cir. 1986) ("[B]ecause denaturalization is civil and equitable in nature, due process [is] satisfied by a fair trial before an impartial decisionmaker.").

In Mandycz's earlier appeal in this case, our court suggested a similar resolution of this issue. Soon after OSI's doctors determined that he was incompetent, Mandycz filed an interlocutory appeal seeking to halt the denaturalization proceeding because it was sufficiently akin to a criminal proceeding. In denying leave to appeal, the court noted that "[d]enaturalization proceedings are technically considered suits in equity, not criminal actions." *United States v. Mandycz*, 351 F.3d 222, 225 n.1 (6th Cir. 2003). "In civil cases," it added, "the competency of a defendant is not irrelevant, of course. Incompetent and infant civil defendants are entitled to the appointment of a guardian ad litem. However, a civil defendant's mental incompetence does not trigger an abatement of trial as it does in the criminal context." *Id.* (citations omitted). Whether these earlier statements were necessary to the resolution of the earlier appeal and therefore bind us as part of the law of the case, *see Moss v. United States*, 323 F.3d 445, 458 (6th Cir. 2003), or represent footnoted dicta unnecessary to the court's determination that it lacked jurisdiction over Mandycz's interlocutory appeal need not detain us. The salient point is that we independently reach the same conclusion today.

Perhaps appreciating this entrenched distinction between the civil and criminal due process protections for incompetent individuals, Mandycz has filed a supplemental brief indicating that he "is not arguing for due process protection for all 'civil' defendants" but only for protection for denaturalization defendants facing his unique circumstances. Mandycz Supp. Br. at 13; *see id.* ("Recognition of such a due process right is only reasonable in light of the extraordinarily unique posture of this case."). While we need not decide today whether there could be a denaturalization proceeding in which due process requires more protection than this civil defendant received, Mandycz has not convinced us that his circumstances warrant an exception to the rule. In one sense, the district court exceeded the requirements of due process as it appointed a guardian for Mandycz without making a finding that he was incompetent; the court apparently determined that the examination results of OSI's doctors sufficed to make the appointment of a guardian appropriate. Nor has anyone alleged that the guardian failed to look after Mandycz's interests or that Mandycz otherwise failed to receive "a fair trial before an impartial decisionmaker." *Kairys*, 782 F.2d at 1384; *see* Mandycz Supp. Br. at 15 (conceding that the denial of other criminal procedure protections—*e.g.*, jury trial—in denaturalization cases was appropriate because of "the assurance that one will still receive a fair trial").

In another sense, the district court was presented with a party who, despite his illness, was able to offer considerable assistance to his defense, a feature of this case that will not invariably be replicated in other civil proceedings involving incompetent parties. Keep in mind that the government first notified Mandycz of its investigation in 1996 when it asked to interview him about whether he had been a guard at Nazi labor and concentration camps. And the government filed this complaint in 2000. Mandycz first complained about memory loss in 2000, and no one contends that he was unable to assist his defense in 1996 when he first learned about this inquiry. Indeed, the district court found that Mandycz exhibited "lucidity at his deposition" in May 2001, D. Ct. Op. at 34, as he "recounted that he was taken from his home to work on a farm in Linz during World War II," a story that was "the same one [he] told his adult daughter throughout her life" and to which she was permitted to testify, *id*. at 33. He told this story in considerable detail, giving his attorneys

ample opportunity to verify his claims and substantiate them with evidence—whether from immigration records, from his family or from acquaintances.

Mandycz, notably, has not challenged the district court's finding that he exhibited "lucidity" at his deposition or the court's finding that his daughter's independent recollections corroborated his version of events. *Compare* JA 1510–11, 1518, 1631 (Mandycz) (agreeing that "in 1943 the Germans were recruiting young men in [Olievo-Korolivka]," and remembering that he was taken "[t]o Austria to work," "to Linz in Austria," and that after the war ended, he went "[t]o Salzburg") *with* Donna Christina Depo. at 132–33 (daughter) ("He said Linz" was where he stayed; "I know he was at home, Olijewa Korliwka, and then he was in Linz. Then he went to Salzburg . . . . I think it was '43 and then '45 the war was over."); *compare also* JA 1519 (Mandycz) ("Trucks came and they were taking us somewhere to camps and we were told you're going to live here. And from here you will be taken to farms.") *with* Christina Depo. at 50–51 (daughter) ("[H]e worked on the farm during the summer" and stayed in "some kind of area where the workers lived . . . ."). Even if we were to acknowledge the possibility of granting an exception to the traditional civil rules for denaturalization proceedings, Mandycz has not shown that this is an appropriate case for doing so.

Mandycz, finally, points out that "an incompetent person may not, as a matter of law, voluntarily renounce his or her citizenship." Mandycz Br. at 27. That may be true but it does not help his claim. Under 8 U.S.C. § 1481(a)(5), "[a] person who is a national of the United States . . . shall lose his nationality by voluntarily . . . making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state." The statute thus requires renunciation to "be by voluntary act," *Perri v. Dulles*, 206 F.2d 586, 589 (3d Cir. 1953), and the law generally places restrictions on the ability of incompetent individuals to accomplish voluntary and legally binding acts, *see McGrath v. Tadayasu Abo*, 186 F.2d 766, 772 (9th Cir. 1951); *see also Spytma v. Howes*, 313 F.3d 363, 370 (6th Cir. 2002). But all of this means only that Mandycz could not voluntarily relinquish his citizenship, not that the government lacks authority to commence an *involuntary* denaturalization proceeding against him under 8 U.S.C. § 1451.

C.

Mandycz next argues that laches barred the government from bringing this denaturalization claim given the lapse of time between the government's first discovery of evidence that Mandycz was a prison guard and the filing of this complaint. We disagree.

Because the United States acted in its sovereign capacity when it sought to denaturalize Mandycz, the common law doctrine of laches does not apply. "It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940). "The ancient rule *quod nullum tempus occurit regi*—'that the sovereign is exempt from the consequences of its laches . . .'—has enjoyed continuing vitality for centuries." *United States v. Peoples Household Furnishings, Inc.*, 75 F.3d 252, 254 (6th Cir. 1996); *see also Hatchett v. United States*, 330 F.3d 875, 887 (6th Cir. 2003) ("It is well established that the Government generally is exempt from the consequences of its laches."); *United States v. Weintraub*, 613 F.2d 612, 618 (6th Cir. 1979).

Whatever the scope of the exception to this rule—triggered when the government stands in the shoes of a private party, as opposed to when it acts in its sovereign capacity, *see Hatchett*, 330 F.3d at 887; *cf. United States v. California*, 507 U.S. 746, 757 (1993)—it does not apply here. When the United States acts to grant or take away the right of citizenship, it quintessentially acts in its sovereign capacity, *see Haile v. Gonzales*, 421 F.3d 493, 494 (7th Cir. 2005), *Faddoul v. INS*, 37 F.3d 185, 189 (5th Cir. 1994), a legal reality confirmed by the incapacity of private parties to remove a fellow American's citizenship or grant it in the first instance.

*Costello v. United States*, 365 U.S. 265 (1961), does not hold otherwise. Noting that it "has consistently adhered to [the] principle" "that laches is not a defense against the sovereign," *id*. at 281, the Court commented that it had not "considered the question of the application of laches in a denaturalization proceeding," *id.* at 282. But "even if we assume the applicability of laches," the Court then held "that the petitioner failed to prove both of the elements which are necessary to the recognition of the defense." *Id.* Invoking this language, Mandycz says that "*Costello* appeared to recognize the possibility laches could be raised as a defense to denaturalization." Mandycz Br. at 49.

But circuit precedent forecloses Mandycz from threading this needle. In *United States v. Weintraub*, 613 F.2d 612, 618 (6th Cir. 1979), we read *Costello* to "admit[] to no exceptions to the rule that laches cannot defeat the government." The "primary holding" of *Costello*, we have already decided, is that "laches was inapplicable." *Id*. at 619; *see also id*. at 619–20 ("The rule is of such long standing that we do not believe the Supreme Court would carve out an exception to it without expressly saying so."); *United States v. Arrow Transp. Co.*, 658 F.2d 392, 395 (5th Cir. 1981) ("*Costello* by no means holds that laches is applicable against the United States.").

But even if we were to consider the defense, it would not aid Mandycz. The laches defense has "two elements: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party." *Brown-Graves Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000). Any "delay" in initiating this case was not unreasonable. Quite understandably, Mandycz does not contend that the government unduly delayed this proceeding during the years between 1949, when Mandycz first entered the country, and 1993, when the government first learned that he might have been a Nazi guard. While Mandycz does challenge the government's decision to wait until 2000 to file this complaint, there were legitimate reasons for that delay. The government acquired the first piece of the puzzle in 1993, when it learned of statements from Gajdich's post-war Soviet trial placing Mandycz at Poniatowa. Fairly choosing not to commence a proceeding on this basis alone, the government "suspended" further investigation "unless and until further personal details . . . came to light." JA 81. More information surfaced in 1994, this time identifying an Iwan Mandycz with a 1920 birth date and a birthplace in Olievo-Korolivka. In 1995, the government received a transfer roster, again with a birth date and birthplace. An impediment remained, however, because the birth dates on these documents (January 23, 1920) did not match the birth date on file for Mandycz (July 23, 1920). To resolve this disparity and others (the existence for example of the Seuring Company), the government requested an interview with Mandycz. When Mandycz, through counsel, refused to be interviewed, that forced the government to confirm independently which of the two birth dates was accurate—which could be done only with the assistance of the then-recently-independent Ukrainian government. This process consumed over two years and required considerable effort. *See, e.g.*, JA 101 (May 20, 1998 letter from OSI to Ukrainian procurator: "[Y]our office indicated that it believed it had responded to all of the requests for assistance that we had submitted since March 1997. In fact, we have received almost none of the materials that Mr. Kyrylenko indicates were forwarded to us."). Having reasonably waited until it could confirm that Mandycz was Guard 3308 and having been unable to obtain Mandycz's cooperation in resolving ambiguities in the record, the government cannot be said to have unreasonably delayed the commencement of this action.

D.

Mandycz, lastly, challenges the authenticity of the Soviet interrogation records and their admissibility under the ancient-documents exception to the hearsay rule. Under that exception, courts may admit into evidence "[s]tatements in a document in existence twenty years or more the authenticity of which is established." Fed. R. Evid. 803(16). Authenticity in turn is a function of whether the document "(A) is in such condition as to create no suspicion concerning its authenticity,

(B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered." Fed. R. Evid. 901(b)(8).

Though conceding that the Soviet interrogation records are at least 20 years old, Mandycz claims that this hearsay exception does not apply because the documents are not "authentic." In support of this argument, he marshals a variety of sources to make the point that the Soviet Union did not value truth—*e.g.*, "To speak the truth is a petty bourgeois prejudice. To lie, on the other hand, is often justified by its ends," Vladimir Lenin *in* Chapman Pincher, *The Secret Offensive* 24 (1985)—then reasons that all documents of the old regime "lack trustworthiness." Mandycz Br. at 35. Putting to one side the sweeping breadth of his argument, it suffers from a more basic problem. "Although Rule 901(b)(8) requires that the document be free of suspicion, that suspicion goes not to the content of the document, but rather to whether the document is what it purports to be." *Demjanjuk*, 367 F.3d at 631. "Whether the contents of the document correctly identify the defendant goes to its weight and is a matter for the trier of fact; it is not relevant to the threshold determination of its admissibility." *Kairys*, 782 F.2d at 1379; *see also Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 661 (6th Cir. 2000) (citing *Kairys* and noting that "[q]uestions as to the documents' content and completeness bear upon the weight to be accorded the evidence and do not affect the threshold question of authenticity"). The authenticity inquiry, then, turns on "whether the document is what it purports to be," not its veracity. *Demjanjuk*, 367 F.3d at 631. Because Mandycz does not argue, much less prove, that the Soviet interrogation records are not what they purport to be—Soviet interrogation records—his contention fails. *See, e.g.*, *Hajda*, 135 F.3d at 442–45 (admitting statements given to communist interrogators); *Kalejs*, 10 F.3d at 447 (same); *United States v. Stelmokas*, 100 F.3d 302, 312 (3d Cir. 1996) (admitting documents that came from Soviet sources or were in Soviet possession); *United States v. Linnas*, 527 F. Supp. 426, 433–34 (E.D.N.Y. 1981) (admitting depositions videotaped by Soviets), *aff'd*, 685 F.2d 427 (2d Cir. 1982).

\* \* \* \* \*

While Iwan Mandycz has only the prospect of review in the Supreme Court before this denaturalization proceeding comes to an end, that does not mean he has reached the end of the road when it comes to deportation. A denaturalization finding permits the Attorney General to seek deportation; it does not require him to do so. The government concedes as much, *see* Gov't Supp. Br. at 1 ("[T]he Government *does* have prosecutorial discretion" "to refrain from removing incompetent persons . . . ."), and acknowledges that it has exercised such discretion before. *See also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999); *Carranza v. INS*, 277 F.3d 65, 72 (1st Cir. 2002). Whether the stamp now placed on Mandycz of having aided Nazi Germany in the persecution and killing of thousands of Jews suffices to vindicate the policies underlying the Displaced Persons Act of 1948 and the Immigration and Nationality Act of 1952 or whether the deportation of this incompetent 86 year old is required as well we leave to the discretion delegated by Congress to the Attorney General. For present purposes, the district court fairly and permissibly concluded that Mandycz was Guard 3308 and accordingly should never have been granted the benefits of United States citizenship.

III.

For these reasons, we affirm.